[No. B225494. Second Dist., Div. One. Nov. 10, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFRED CARLOS HERNANDEZ, Defendant and Appellant.

954

**COUNSEL**

Law Office of E. Thomas Dunn, Jr., and E. Thomas Dunn, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Shira B. Seigle, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.—**

### SUMMARY

A jury convicted Alfred Carlos Hernandez of one count of continuous sexual abuse of a child under the age of 14 years. Appellant contends the trial

court erred by admitting evidence of uncharged sexual offenses, tolling the statute of limitations and refusing to sustain his challenge to a juror for cause. We affirm.

## PROCEDURAL BACKGROUND

The operative information alleged that between November 26, 1990, and November 25, 1999, defendant and appellant Alfred Carlos Hernandez committed the crime of continuous sexual abuse, in violation of Penal Code section 288.5, subdivision (a), by engaging in at least three acts of " 'substantial sexual conduct' " (Pen. Code, § 1203.066, subd. (b)), and at least three lewd and lascivious acts (Pen. Code, § 288) with his granddaughter, Erica H., a child under 14 years old. The information further alleged that Erica had been under 18 at the time of the crimes, that she reported the crimes to the police and a complaint was filed within one year of that reporting, and that there was independent evidence that clearly and convincingly corroborated the allegations. (Pen. Code, § 803, subd. (f).) The information also alleged that appellant had substantial sexual conduct with a victim under 11 years old. (Pen. Code, § 1203.066, subd. (a)(8).)

Appellant pleaded not guilty and denied the special allegations. The prosecution filed a successful pretrial motion seeking to introduce evidence of other uncharged sexual offenses pursuant to Evidence Code section 1108.[1]

Appellant was found guilty as charged and sentenced to 12 years in state prison.

## FACTUAL BACKGROUND

A. *The prosecution's evidence*

1. *Appellant's daughter Kathy*

Appellant and his late wife, Rita, had five children: Fred, Kathy, Robert, Gloria, and Kim.[2] Appellant has several grandchildren. They include Robert's daughter, Erica (the victim), Sunnie, Theresa and Alyssa. Rita died in 1987. Appellant remarried in 1993. At the time of trial, Kathy was 49, Gloria was 46, and Erica was 24 years old.

From the time Kathy was in second grade until about the time she was a freshman in high school, she lived with her parents and siblings in a house in

---

[1] Undesignated statutory references are to the Evidence Code.

[2] Many witnesses share Hernandez's surname. For clarity, we refer to some witnesses by first name.

Inglewood in which all the children shared one bedroom. One night, when she was eight to 10 years old, Kathy got up to go to the bathroom. As she left the bathroom, her father came in and told her to wait. He pulled out his penis, grabbed Kathy's hand and placed it on his penis, wrapping his hand tightly around hers so she could not remove it. Appellant moved Kathy's hand back and forth in a stroking motion until he ejaculated. When Kathy tried to leave, appellant said, "shhh" as if trying to calm her. Kathy was dazed and thought the whole thing was a nightmare. After that incident, appellant continued to pat Kathy's butt on occasion and to make comments about women's bodies that made her uncomfortable.

By the time Kathy was about 14 years old, the family had moved into an apartment elsewhere in Inglewood. Kathy had her own bedroom. Typically, she slept in two-piece pajamas that snapped together. One night, Kathy was awakened when her father entered her bedroom. He put his hand over her mouth and put a pillow over her face, and pulled back the covers. Kathy's arms and legs flailed about as she tried to get the pillow off of her face and appellant's hand off of her mouth. In the course of that struggle, she knocked over a lamp and appellant tried to hold her hands down. Appellant unsnapped and removed Kathy's pajama bottoms and underwear and inserted his fingers into her vagina. He also inserted his penis into her vagina and said, "Don't worry, you won't get pregnant. I'm fixed." Kathy was afraid and "just wanted [appellant] to get off" and out of her room. Appellant stopped and quickly got off Kathy when they heard footsteps in the hall. Kathy's mother came into the room, turned on a light and asked what was going on. Appellant told his wife Kathy had a nightmare. Rita straightened the blankets on Kathy's bed, saw that her daughter was naked from the waist down and slapped her. Later, Kathy saw blood in her underwear. Kathy never talked to her mother about what her father had done.

Appellant put his fingers inside Kathy's vagina on other occasions. She also recalled he had licked her vagina, although she could not recall how old she was at the time that occurred. Kathy had "suppressed" most of her memories of her father's sexual abuse and her memory was "fragmented." The first time she told anyone her father had molested her was as an adult, during confession to a priest. She told her brothers and sisters after their mother died, but did not share the details with them. She never told anyone about the incident in the bathroom or about having been raped by her father.

Kathy moved out of the family home at 19 years old. Her relationship with her father was strained and she had tried to distance herself from him. But she also tried to maintain a "facade of normalcy" with appellant for the benefit of her family. By the time of trial, it had been at least 30 years since appellant engaged in sexual conduct toward Kathy. Kathy believed Erica's

account of molestation by appellant, so she decided to talk to the police. She felt guilty for not having reported her father; if she had, her niece might not have been abused.

### 2.   *Appellant's daughter Gloria*

Gloria is three years younger than Kathy. Beginning when Gloria was four or five years old until she was in middle school, Gloria used to lie on the living room couch with her father in the family's house in Inglewood. While the other kids watched cartoons in the morning (and her mother slept), appellant would cover himself and Gloria with a blanket and touch her chest and vagina. The touching happened so often that, at first, Gloria did not realize what her father did was wrong; she grew uncomfortable with it as she got older.

When the family moved to their new apartment, Gloria shared a room with her younger sister Kim. Beginning when she was nine or 10 years old, Gloria slept in her clothes to try to keep her father from touching her at night. When she was in third or fourth grade, she began putting a trash can behind the bedroom door so she would hear if anyone came in the room at night. Several times, Gloria heard the bedroom door open and saw her father standing in the doorway. Once he came in and tried to kiss her on the mouth. Sometimes he came in the bathroom while she showered. When Gloria was in middle school, appellant would kiss her neck, touch her breasts and try to stick his hand in her pants.

Once, when she was asleep in her room, Gloria heard Kathy scream, heard something fall and heard someone running in the hall. Gloria and Kim went to Kathy's bedroom. Kathy was in the room crying; Rita stood at the door; and appellant was coming out of the room wearing only underwear. Appellant told Gloria that Kathy had a nightmare; Rita told her to go back to bed.

Gloria once told her mother that appellant had touched her. Her mother replied that her "dad loves you and wouldn't do anything like that." Gloria never told anyone else about appellant touching her inappropriately. She was ashamed and thought that if her mother had not believed her no one would. She became involved in extracurricular activities in high school to avoid appellant and being at home.

Gloria's daughter, Sunnie, was born when Gloria was 17 years old. Gloria lived with her parents when she was in college for financial reasons and because her mother helped care for Sunnie when she was at school or work. Appellant may have picked Sunnie up at school on some occasions. Gloria moved out when she was 24, shortly after her mother died. Gloria allowed

her child to stay in the house with appellant because she was in denial about what happened to her and because she believed Rita would protect her.

When Gloria was 19 years old, her father tried to rape her. She had come home from work late one night and sat down next to appellant, who was watching television on the couch in the living room. Gloria fell asleep. When she woke up, her father had unbuttoned her shirt, was sucking on her breast, and had unbuckled her pants and was trying to pull them down. Gloria fought appellant trying to keep her pants on as he put a pillow over her face and pulled her pants and underwear down. Appellant unzipped his pants, pulled out his penis and tried to insert it into Gloria's vagina. Her screams were muffled by the pillow. Gloria put her own fingers into her vagina so her father could not penetrate her. Appellant told her, "I can't get you pregnant, I'm fixed," and called her "Rita." Gloria's mother was still alive at the time. Gloria scratched appellant's neck and "he finally gave up."

Gloria told the man she was dating at the time about what had happened. After Rita died, she also confided in Kathy. In 1988 Gloria told her ex-husband about the molestation. She had been in therapy on and off since her teens, and was diagnosed with posttraumatic stress disorder. She has nightmares, stomachaches, anxiety and depression due to these incidents. Gloria limited her contact with her father after Rita died. When she heard something had happened to Erica, Gloria felt guilty that she had not reported her father earlier, thinking—like Kathy—that doing so might have prevented Erica's molestation. She decided to file a police complaint. As a result of her role in accusing her father of sexual abuse, Gloria no longer has a relationship with her older brother or her sister Kim.

### 3. *The victim, appellant's granddaughter, Erica*

As a young child, Erica spent a lot of time with appellant, her paternal grandfather. She lived part time with her father, Robert. Appellant lived in another unit at the same apartment complex. Her mother, Fiona, lived down the street. Appellant often looked after Erica while her father worked.

When Erica was about five years old her grandfather began putting his hand under her clothes, and touching her breasts and vagina when they were inside his garage or near his car. This type of touching occurred at least 10 times. Appellant "kissed [Erica] all the time" and, when she was six, began putting his tongue in her mouth.

On one occasion when she was six, Erica asked her grandfather if she could drive his car. He agreed and placed her on his lap. As they drove around, appellant put his hand underneath Erica's clothing touching her

breasts and vagina. He then parked the car in an alley behind his apartment, moved to the passenger seat and unzipped his pants. He grabbed Erica's hand, put it on his penis, and had her stroke his penis controlling her movements up and down.

When Erica was seven, she was watching television in appellant's bedroom. Inside the room was a glass case in which her grandfather displayed his guns. Appellant came into the room, got on the bed and turned on a pornographic movie. He told Erica to take off her pants; she complied. Appellant pulled his pants down and touched Erica's chest and vagina while they watched the movie. He told Erica, "we're going to do what they do," placed her hand on his penis and moved her hand up and down. When the woman in the movie started to perform oral sex, appellant told Erica "to do exactly what the lady was doing in the porno to him." He placed Erica on top of him and told her to suck his penis. When she hesitated he pushed her head onto his penis. Appellant performed oral sex on Erica. He then moved her off of him, put his finger inside Erica's vagina, and then partially penetrated her vagina with his penis; it hurt her. Appellant told Erica he would kill her if she told anyone what had happened. As he said this, one of appellant's guns lay on the bed. Erica believed her grandfather and was afraid. This was the only occasion on which appellant had intercourse with or performed oral sex on Erica. But the sexual molestation did not stop. Erica testified that her grandfather rubbed her vagina with his hand "more than five times" afterwards, actually penetrating her vagina "more than twice." Appellant continued to touch Erica's breasts and vagina under her clothing more than once every year. Erica did not tell anyone about what had happened because she did not know it was wrong. Before she turned 18, Erica told friends what her grandfather had done but never told an adult. She was "still afraid of" appellant—afraid she would get in trouble or that something would happen to her or her dad.

From the time she was five until she was 19, whenever Erica asked her grandfather for money he would fold it up and put it in her bra or panties, touching Erica's vagina as he did so. Once, when she was in eighth grade, appellant took Erica's breast out of her bra and sucked on it while giving her money. Erica knew her grandfather would touch her inappropriately when she asked him for money, but she had "adapted" to his behavior so it "didn't bother" her. Erica testified that her grandfather touched her breasts or some other part of her body in a sexual manner "every time" she saw him and at least 20 times overall. Erica last saw appellant in 2007 when she was 20 or 21 years old.

### 4. *Events following Erica's disclosure of appellant's sexual abuse*

In March 2008, Erica revealed the fact that appellant had molested her to her mother. She decided to do so after her own father became involved with Erica's friend who was much younger than her father, and the event "brought back memories." A few days later Erica, her mother, appellant's daughters Kim and Gloria, and Gloria's daughter Sunnie met at Sunnie's house where Gloria revealed that appellant also had molested her, but did not disclose any details. After that family meeting on March 24, 2008, Erica's mother took her to the police station to report appellant's sexual abuse. After the meeting at Sunnie's house, Erica's mother spoke with Kathy on the phone. Kathy did not tell Fiona she had been molested. Kathy felt a responsibility to go to the police after discussions with her sisters and niece led her to believe that something of a sexual nature had occurred between her father and Erica. She believed that if she had reported her molestation earlier, her father would not have been able to do the same thing to Erica. Gloria and Kathy went to the police the same day Erica reported appellant's abuse.

When she first reported the abuse, Erica spoke with a male officer. She was uncomfortable telling him the full details of the molestation. Later, she spoke with a female detective, with whom she felt more comfortable and to whom she relayed more complete details of the sexual abuse. Afterward, Erica wrote a blog in which she said angry things about appellant, some of which she later regretted. She also posted a picture of herself holding a gun on her MySpace account. At the preliminary hearing, Erica denied writing such a blog. At trial, she admitted that she had lied about the posting because she had been embarrassed.

After the sexual abuse was reported to the police, appellant stopped by Sunnie's house unexpectedly to "explain the encounter that he had with [Gloria] when she was a teenager." He told Sunnie he and Gloria had one "mutual" sexual encounter. Sunnie asked her grandfather about a specific incident involving Kathy when she was 13 years old. Appellant replied that he had a record of helping Sunnie pay for medical care. He left after Sunnie asked him how that related to her question about the incident with Kathy. No family member told Sunnie she would be disowned if she went against Gloria and Kathy. But she acknowledged that there was tension in the family because she felt comfortable around her grandfather.

### 5. *Expert witness*

Dr. Jayme Jones, a clinical psychologist, testified as an expert in child sexual abuse accommodation syndrome (CSAAS). CSAAS is used to help understand the behavior of victims following abuse, particularly as it relates

to their disclosure or lack thereof. The model also applies to adults abused as children. CSAAS does not predict abuse. Rather, it is used to help understand a victim's behavior after abuse occurs.

The CSAAS model has five components: (1) secrecy, (2) helplessness, (3) accommodation, (4) delayed disclosure, and (5) retraction. "Secrecy" comes first because most child sexual abuse happens in secret. The longer the secret continues, "the more the child feels like an accomplice rather than a victim. They start to feel more guilty. They start to feel blame. The more the child feels that, the more they'll keep the secret." "Helplessness" refers to the child's physical helplessness and inability to fight back. It also refers to the notion that children are raised to obey adults and, as a result may feel uncomfortable saying no to an abusive adult. "Accommodation" is the notion that, if children feel helpless, they adapt in order to make the abuse more tolerable. For example, a child may pretend to be asleep during the abuse or pretend something is not actually happening. Many victims continue displaying affection toward their abuser, especially if he or she is a family member. "Delayed disclosure" reflects the fact that most abuse victims do not immediately disclose the abuse and, when they do, reveal only small details to see if the person to whom the information is disclosed is supportive. If not, the victim will most likely shut down. "Retraction" occurs when a child discloses the abuse and then, when familial support is lacking, takes "back what they said in hopes of making the bad stuff that happened go away."

Feelings of helplessness, fear of upsetting ones parents, and being raised not to discuss sex combine to create circumstances making it unlikely a victim of sexual abuse will disclose the abuse. It is also common for abusers to try to make the victim complicit in the abuse by having the child do something forbidden like watching pornography, or driving a car. Disclosure of child abuse is rare and, when it does occur, is usually done in a disjointed fashion. Bits and pieces of information may be told at different times to different people, making it appear as though the victim is making conflicting disclosures. Disclosure to family members is very rare, because children do not want to upset the family. Disclosure to the police is even rarer, even if the family knows about the abuse. For adults abused as children, disclosure is even more difficult because of the passage of time since the abuse occurred. It is common for adults to try not to remember the abuse. The younger a victim is when the abuse begins, the less likely it is that he or she will disclose it. About 50 percent of all victims of sexual abuse never disclose the abuse. Substance abuse, as a coping mechanism, is common among victims of sexual abuse, as are disciplinary problems and reckless behavior due to lowered self-esteem. There are many different reasons victims choose to disclose. Adult victims may come forward after another victim has disclosed.

According to Jones, it is common for an abused child to wear multiple layers of clothing to protect him or herself. Putting an object in front of a bedroom door is another way a victim might accommodate. A child who had accepted money or gifts from his or her abuser would continue to accept them even though they know abuse was connected because they might think "this time will be different; I'll get the gift, and not the bad stuff." Others might think that because the abuser is "doing this bad stuff, I might as well get the good stuff too."

B.   *The defense evidence*

1.   *Police officers*

Inglewood Police Officer Adam Butler interviewed Erica for 15 minutes on March 24, 2008. She told him her grandfather raped her twice and sexually abused her on a daily basis.

Sherry Rumsey, a detective in the Inglewood Police Department's sex crimes, child abuse, and elder abuse unit, interviewed Erica on April 7, 2008. Erica told Rumsey that between the ages of seven and 10, she had sex with appellant more than two, but fewer than five times. She said the abuse began when she was five or six years old and ended before she turned 18. In another interview with Rumsey, Erica said she had twice had sex[3] with appellant, and said there was a gun on top of a mirror above the bed during one incident. Erica provided more details about the abuse to Rumsey than she had to Butler. This did not surprise Rumsey; in her experience victims tended to divulge more to her because she is female.

2.   *Appellant's wife*

Lois Hernandez met appellant in 1989, lived with him at his apartment complex in Inglewood for about two years and married him in 1993. During the time she lived with appellant, Lois got to know his children and grandchildren. Before marrying appellant, Lois had a "cordial" relationship with Gloria and Kathy. Appellant arranged his schedule so he could pick up Sunnie from school and Sunnie once spent the night at Lois and appellant's house. Kathy had visited once a week, but stopped calling after appellant refused to help her pay for college. Gloria became distant after Lois and appellant got married. Lois's relationship with her husband's other children did not change after their marriage.

---

[3] By "sex," Rumsey said she had assumed that Erica meant sexual intercourse, but she had not asked Erica to define the word. Erica had used "sex" to describe all the different types of sexual activities she reported to Rumsey.

Erica never spent the night at Lois and appellant's house and, as far as she knew, never visited appellant's house unless Lois was also home. Erica was "fond of money" and, often when she came to see her grandfather, would kiss him on the cheek, give him a hug and ask him for money. Appellant gave Erica money whenever she asked. Lois never saw her husband put money in Erica's bra or panties. Lois never saw her husband engage in any inappropriate behavior with Erica, and she felt Erica took advantage of appellant. Once, Lois saw a picture on Erica's MySpace page of Erica posing with a gun and a pile of marijuana on a table in the background.

### 3. *Appellant's daughter Kim*

Kim was in fourth grade when her family moved into the apartment in Inglewood. She and Gloria had always been close, but she had a strained relationship with Kathy. In 1992, Gloria said "something . . . happened," but she did not want to get into the details. Kim was close to all her nieces, including Erica. There was nothing unusual about Sunnie's interactions with appellant. After Rita died, appellant had picked Sunnie up at school about 95 percent of the time.

Kim met with Gloria, Erica and Fiona at Sunnie's house after receiving a text from Sunnie about a family emergency. Gloria did most of the talking. She was very emotional, but never said anything about appellant having molested her. The next day, Gloria told Kim she would never speak to her again if she did not side with her. Kim also saw the photograph of Erica holding a gun with marijuana in the background.

### 4. *Appellant's granddaughters Alyssa and Theresa*

Although she has never been left alone with him, appellant's granddaughter Alyssa has spent a lot of time with her grandfather, and never felt uncomfortable around him.

Appellant's granddaughter Theresa spent time around appellant when she was growing up; she was never uncomfortable around him. Theresa knew that Erica, Gloria and Kathy complained to the police in 2008. She spoke to Kathy about it a year afterward, but has not talked to her since. In that conversation, Kathy said Erica was "doing this [(i.e., reporting the abuse)] for [us]," meaning Kathy and Gloria.

## DISCUSSION

1. *Admission of uncharged sexual offenses*

Appellant contends the trial court abused its discretion by admitting evidence of uncharged sexual offenses committed against Kathy and Gloria between the ages of about eight and five, respectively, and 19. (§§ 352, 1108.)

■ Character or disposition evidence is generally inadmissible to prove a defendant's conduct on a specified occasion. (§ 1101, subds. (a), (b).) Section 1108 creates an exception: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a); see *People v. Soto* (1998) 64 Cal.App.4th 966, 982–983 [75 Cal.Rptr.2d 605] (*Soto*); *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1115–1116 [109 Cal.Rptr.3d 715] (*Nguyen*).) In enacting section 1108 the Legislature recognized the " 'serious and secretive nature of sex crimes and the often resulting credibility contest at trial,' " and intended in sex offense cases to relax the evidentiary restraints imposed by section 1101 "to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*).) By its terms, section 1108 requires a trial court to engage in a section 352 analysis before admitting evidence of prior sex offenses.

■ In *Falsetta*, our Supreme Court upheld the constitutionality of section 1108 against a due process challenge, concluding that the weighing process of section 352 would be a sufficient safeguard against undue prejudice from such propensity evidence. In reaching this conclusion the court established the criteria for courts to consider when ruling on the admissibility of evidence of prior sexual offenses. (*Falsetta, supra*, 21 Cal.4th at pp. 916–917.) The factors to be considered in conducting the analysis depend on the unique facts and issues of each case. (*Ibid.*; *Nguyen, supra*, 184 Cal.App.4th at p. 1116.) Several factors are particularly significant in a section 1108 case. They are: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of

time. [Citation.] A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors." (*Nguyen, supra*, 184 Cal.App.4th at p. 1117, citing *People v. Branch* (2001) 91 Cal.App.4th 274, 282 [109 Cal.Rptr.2d 870] (*Branch*).)

The "determination as to whether the probative value of such evidence is substantially outweighed by the possibility of . . . unfair prejudice or misleading the jury is 'entrusted to the sound discretion of the trial judge who is the best position to evaluate the evidence.' [Citation.]" (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097 [117 Cal.Rptr.3d 239].) We review rulings under section 352 for abuse of discretion. (*Miramontes*, at p. 1097.) "A trial court's exercise of its discretion under section 352 ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337 [92 Cal.Rptr.2d 433], italics omitted.)

Appellant contends the court abused its discretion in admitting evidence that he committed uncharged sex offenses to show his propensity to commit such crimes. He maintains the evidence should have been excluded because it was too remote in time, too dissimilar to the current charged offense, highly inflammatory and, because he had never been punished for those crimes, there was a danger the jury would use the present case as a means of imposing punishment for having violently raped his daughters. We disagree.

As for the trial court's finding on the first factor—that evidence of uncharged crimes was highly probative—appellant argues the court was wrong because the nature of the offenses against his daughters was "qualitatively different" than the charged offense against his granddaughter. He is mistaken.

■ First, there is no requirement that the charged and uncharged offenses be so similar that evidence of the prior acts would be admissible under section 1101. If such strict similarities were required, "section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." (*People v. Frazier* (2001) 89 Cal.App.4th 30, 40–41 [107 Cal.Rptr.2d 100], fn. omitted.) Nevertheless, it follows that uncharged prior offenses that are very similar in nature to the charged crime logically will have more probative value in proving propensity to commit the charged offense. (*Branch, supra*, 91 Cal.App.4th at p. 285.)

In this case the charged and uncharged offenses bear significant similarities. Both involved allegations of inappropriate touching of female victims

with close familial ties to appellant and under his care. Appellant's sexual abuse of each victim began when she was quite young: Gloria and Erica were each four or five years old when appellant first began to touch them inappropriately; Kathy was eight to 10 years old. All the victims were molested over the course of their adolescence and teenage years, ending when each was 18 to 19 years old. The abuse almost always occurred inside appellant's home. Both Kathy and Erica described incidents of abuse in which appellant used their hands to masturbate himself. Gloria and Erica recounted numerous instances during which appellant fondled their chests and vaginas. Physical force or actual or threatened violence was involved in the uncharged and the charged offenses: appellant smothered his daughters with pillows, held Kathy's hands down while raping her, and physically struggled with Gloria when he tried to rape her on the couch. He put a gun on the bed when he raped Erica and then threatened to kill her if she revealed what he had done. Each of the victims suffered actual or attempted vaginal penetration by appellant's penis.

The trial court found the section 1108 evidence "extremely probative" as a demonstration of appellant's propensity to make unsolicited sexual advances against young female children with whom he has a close familial connection while they are entrusted to his care. It observed that the "testimony of the defendant's daughters and any female grandchildren is going to be highly probative as to whether or not the defendant, as a father and grandfather, in a position of trust as a caretaker, committed repeated lewd acts with his grandchild and/or the daughters; whether or not that's in conformity, or shows a propensity for the commission of that conduct. [¶] . . . [¶] [A]s it relates to the familial setting, the scope of the victims and the victimology is very specific and very unique; namely, female children or descendants of the defendant who either reside in that home, or are being cared for by the defendant. [¶] So it's a very small pool of potential victims, and the testimony of persons who are within that pool is very probative." That conclusion was well founded.

Appellate courts have found similar evidence admissible under section 1108. (See, e.g., *Frazier, supra*, 89 Cal.App.4th at pp. 33, 40 [evidence that defendant sexually abused his nieces and cousins is admissible to show propensity to molest young female relatives]; *Soto, supra*, 64 Cal.App.4th at pp. 991–992 [propensity evidence highly probative of defendant's sexual misconduct when left alone with young female relatives].) In any event, any dissimilarities in the alleged incidents relate only to the weight of the evidence, not its admissibility. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 660 [14 Cal.Rptr.3d 534].) The court considered the potential for undue prejudice and found that allowing Gloria and Kathy to testify would not be "unduly prejudicial when considering the fact that all of the offenses are relatively consistent in the nature and scope of the proffer of the testimony."

■ The court was most troubled by the "remoteness aspect" of the section 1108 analysis. The trial judge acknowledged that, "depending on how you frame that time, it's either something that could be as long as 40 years from the beginning of the first alleged offense against the daughter to the completion of the last alleged offense against the granddaughter, or as recent as seven or eight years if you're construing that time frame from the last alleged offense against a daughter and the beginning of the offense against a granddaughter." Even considering only the lengthiest time gap that might be involved here, the passage of time generally goes to the weight of the evidence, not its admissibility. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1173 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Moreover, as the court explained in affirming the conviction in *Branch*, "significant similarities between the prior and the charged offenses may 'balance[] out the remoteness.' [Citation.]" (*Branch, supra,* 91 Cal.App.4th at p. 285 [30-year gap between offenses not too remote where prior and current offenses were "remarkably similar"].) In other words, if the uncharged crimes "are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*Ibid.*; see also *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [95 Cal.Rptr.2d 45] [gap of up to 20 years not too remote given similarity of prior and current acts]; *Soto, supra,* 64 Cal.App.4th at pp. 977–978, 992 [passage of 20 to 30 years does not automatically render prior incidents prejudicial when uncharged and charged sexual offenses are similar].)

Appellant also asserts that the uncharged offenses should have been excluded because the passage of time caused available witnesses' memories to fade and because Rita—the "only witness who could have spoken to the truth of the witnesses' assertions"—was dead and could not confirm or refute her daughters' accusations. He claims that it was impossible for him to defend the uncharged crimes. We disagree.

First, apart from Rita, appellant does not identify any witness who was not available to testify on his behalf. Gloria testified that she and Kim, with whom she shared a bedroom, heard Kathy scream the night she was raped and headed down the hall to Kathy's bedroom, from which their father emerged in his underwear. Kim, a percipient witness, might have assisted the defense and refuted this testimony, but appellant chose not to question her at trial about that incident. Kim also could have confirmed or refuted Gloria's claim that she slept in her clothes as a child and put a trashcan behind their shared bedroom door at night. Gloria also testified that she told a former boyfriend and ex-husband about her father's sexual abuse. The ex-husband was never questioned by appellant in an effort to refute Gloria's revelations, even though he attended the trial and was available to testify. Appellant did challenge his daughters' and Erica's credibility on cross-examination. He also presented testimony by three granddaughters—one of whom he had regularly

picked up at school when she was a child—to discredit the idea that he had a propensity to molest young female family members.

Second, as the Supreme Court observed in *Falsetta*, a principal reason for the enactment of section 1108 to permit admission of propensity evidence in sex crime cases was the Legislature's recognition of the " 'serious and secretive nature of sex crimes.' " (*Falsetta, supra*, 21 Cal.4th at p. 918.) Most sex crimes occur in secret. Thus, here, as in most cases of the sort, the number of witnesses potentially available to aid the defense will be limited. Gloria and Kathy had specific recall of events. Appellant chose not to call other family members or witnesses who were available and may have cast doubt on their stories.

Finally, appellant asserts that the section 1108 evidence was inflammatory because the jury was likely to be overwhelmed by the images of violent rape painted by Gloria and Kathy, inclined belatedly to punish him for acts against his daughters, and distracted from their charge of deciding the truth of Erica's accusations. We disagree.

There is no indication in the record that the jury punished appellant for the prior offenses. In accordance with CALCRIM No. 1191, the jury was instructed to consider the evidence of the uncharged crimes only for the purpose of showing that appellant "was disposed or inclined to commit sexual offenses" and was admonished not to "consider this evidence for any other purpose." During deliberations, the jurors requested clarification of that instruction. The court again instructed the jury that the "commission of the uncharged sex offense(s) by itself is insufficient to prove guilt." We presume jurors understand and follow instructions. (*People v. Morales* (2001) 25 Cal.4th 34, 47 [104 Cal.Rptr.2d 582, 18 P.3d 11].) These instructions, combined with the fact that the impact of the prior offenses was no more egregious than the charged offense which was supported by Erica's testimony, foreclosed the risk the jury would consider the evidence for a prohibited purpose.

■ In sum, we conclude the trial court discharged its duty, conducted the appropriate analysis and found the evidence of the uncharged sex crimes more probative than prejudicial. Appellant has not demonstrated that the court abused its discretion and no error has been shown.

## 2. *Statute of limitations*

Appellant claims there was no valid basis for extending the statute of limitations in this action because the prosecution failed to prove the factors required by Penal Code section 803 (section 803), subdivision (f) to toll the

statute. Specifically, he maintains the prosecution failed to satisfy section 803, subdivision (f)(2)(C), which requires clear and convincing "independent evidence that corroborates the victim's allegation." This argument is misplaced.

The tolling provision contained in Penal Code section 803, subdivision (f), applies only if "[t]he limitation period specified in Section 800, 801, or 801.1, whichever is later, has expired." (§ 803, subd. (f)(2)(A).) In pertinent part, Penal Code section 801.1 (section 801.1), subdivision (a), provides: "Notwithstanding any other limitation of time described in this chapter, prosecution for a felony offense described in [Penal Code] Section . . . 288.5 . . . that is alleged to have been committed when the victim was under the age of 18 years, may be commenced any time prior to the victim's 28th birthday." Appellant was charged with having committed the crime of continuous sexual abuse against Erica while she was under age 18, a violation of Penal Code section 288.5. Erica was 24 years old at the time of trial.

The prosecution initially proceeded under the theory that the tolling provisions of Penal Code section 803, subdivision (f) governed this action. The court disagreed. While conferring with counsel regarding whether to instruct on the elements required to toll the statute of limitations under section 803, the court observed that the correct statute of limitations was actually Penal Code section 801.1. The parties agreed and the jury was never instructed on the elements of section 803, subdivision (f). The court was correct. The action was timely under section 801.1.

### 3. *The trial court's refusal to excuse a juror for cause*

During voir dire, one juror revealed she was married to a police officer and had been "programmed" to believe people who are arrested are guilty. Appellant challenged this juror for cause. The trial court rejected the challenge and the juror was seated and heard this case. Appellant insists his trial was "fundamentally unfair because he was deprived of a completely fair and unbiased jury" when the trial court refused to sustain his challenge to the juror for cause.

This claim is not preserved for appeal. Defendant exercised only seven of 10 available peremptory challenges, leaving three remaining when he accepted the jury. (Code Civ. Proc., § 231, subd. (a).) " 'To preserve a claim of error in the denial of a challenge for cause, the defense must exhaust its peremptory challenges . . . .' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487 [117 Cal.Rptr.2d 45, 40 P.3d 754]; see *People v. Farley* (2009) 46 Cal.4th 1053, 1096 [96 Cal.Rptr.3d 191, 210 P.3d 361] [defendant's claim that trial court erroneously denied his challenge for cause not preserved on appeal for failure to use all peremptory challenges].)

## DISPOSITION

The judgment is affirmed.

Rothschild, Acting P. J., and Chaney, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 15, 2012, S198839.