Filed 12/16/20  P. v. Douglas CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONALD MITCHELL DOUGLAS,<br><br>    Defendant and Appellant. | B297130<br><br>Los Angeles County<br>Super. Ct. No. VA147563 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debra Cole-Hall, Judge.  Affirmed as modified.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah Hill and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ronald Mitchell Douglas of forcible rape, forcible oral copulation, and sodomy by force. He appeals, and we affirm as modified.

## BACKGROUND

An information charged Douglas with two counts of forcible rape (Pen. Code,[1] § 261, subd. (a)(2), counts 1 and 2), one count of forcible oral copulation (former § 288a, subd. (c)(2)(A), count 3), and one count of sodomy by use of force (§ 286, subd. (c)(2)(A), count 4).

At trial, Zoila T. testified she met Douglas for the first time while she smoked a cigarette outside a gaming establishment in Norwalk, between 2:00 a.m. and 3:00 a.m. on November 19, 2015. Zoila's first language was Spanish (she testified through an interpreter), although she understood a little English. Douglas, who spoke English, offered her a ride home on his scooter. Zoila accepted, because she had to work the next day. It was cold and windy outside.

Douglas put a small semiautomatic pistol under the seat of the scooter. Zoila got onto the back of the scooter. Douglas wore a helmet, and offered Zoila one. The helmet covered her face and made it difficult to see where he was taking her. Douglas stopped the scooter by a ranch house with a detached garage and told Zoila he was going to get something from his house. He got off the scooter and invited Zoila to come inside. She accepted because she was very cold after the ride. Douglas took the gun from the scooter and opened the garage door. Once inside, he closed the door and put the gun on top of

a piece of furniture, where Zoila could see it the entire time she was in the garage.

Douglas told Zoila to sit down, and she sat on a couch, about 15 feet away from the gun. Douglas offered her a shot of vodka, which she refused. Douglas asked Zoila what she did for a living, and she said she worked and painted, she was a lesbian, and she had a girlfriend. Zoila asked Douglas to take her home, and he told her to wait a minute, and to keep talking.

Douglas sat on the couch with Zoila, and told her to relax and get comfortable. He unbuttoned her jeans and pulled them down and off, although she tried to push his hands away and hold her jeans up. When Zoila cried and asked Douglas why he was doing this, he told her to just calm down and relax.

Douglas got on top of Zoila as she lay on her back, using one hand to hold both her hands above her head. Douglas put his penis inside her vagina as she continued to cry and ask why he was doing this to her. He told her to relax and be quiet. Zoila tried to push him off, but he was stronger and she was afraid he would hurt her. When she told him to stop he told her to calm down.

With Zoila turned onto her stomach with her head down, Douglas tried to put his penis into her anus. That hurt, and Zoila tried to turn around and told Douglas to stop. Then she heard a knock, and Douglas went about 20 feet away to see who it was. He was gone for 10 to 15 minutes. Zoila was crying. She was too scared to scream, and she tried to put her clothes on.

Douglas came back and sat in a chair next to the couch. He told Zoila to get comfortable on the couch, got on top of her again, and put his penis inside her vagina. She continued to cry and ask him why.

Zoila asked Douglas to let her use the bathroom. He took her into the house through the front door, and entered the bathroom with her. As she sat on the toilet, Douglas stood in front of her, pulled down his shorts, took out his penis, and holding it in one hand, put his penis on her lips. Zoila turned her face away and moved her upper body back, and told him she wanted a drink of water. Douglas pulled his shorts up, opened the bathroom door, and took her to the kitchen, where he gave her a drink of water. She did not scream for help, because nobody was there.

Zoila told Douglas she wanted to go home, and he said that was fine and he would take her. They returned to the garage, where she asked again. After about 10 minutes, Douglas took the gun and gave her a ride to where she asked him to go (a main street near her house). She had her cell phone that night, but did not call for help because she didn't know where it was. Her cell phone records showed no calls between 10:37 p.m. on November 18 and 4:30 a.m. on November 19.

On November 21, at 1:40 a.m., Zoila's girlfriend drove her to the Norwalk sheriff's station. A deputy took Zoila's statement and accompanied her to a hospital, where she talked to a nurse who did an internal exam. The jury saw photographs of bruises on Zoila's left shoulder, inner thigh, and breast, all inflicted during the rapes.

At trial, Zoila was 100 percent sure that Douglas was the man who assaulted her. She had not identified him in a photographic array on November 17, 2016, a year after the rapes, because his photo did not look the same, and the detective told her to select no one if she was not completely sure.

A sheriff's department criminalist testified she tested the samples from Zoila's sexual assault response team (SART) kit. She detected sperm in the samples from Zoila's vulva and vagina. She forwarded the samples to the DNA analyst, who testified the sperm in the vaginal sample matched Douglas's DNA.

Deputy Frank Ozuna interviewed Zoila at the sheriff's station and took her to the hospital. She did not mention the gun, the oral copulation, or the sodomy. Zoila told him her assailant was a Black male named Ronald, who told her "shut up. There is no one there that can hear you," when she told him to stop.

The SART nurse who examined Zoila at the hospital testified she noticed bruises on Zoila's left shoulder and inner thigh and an abrasion on her left breast, which could have been caused by blunt trauma or squeezing. She did not see injuries to Zoila's vagina or anus, but forcible vaginal intercourse does not always cause injury. The nurse took DNA swabs of Zoila's mouth, neck, breasts, hands, vulva, anus, vagina, and cervix, and sealed them into a SART kit. The nurse also took blood and urine samples.

Zoila told the nurse she had voluntarily consumed vodka within 12 hours before the assault, and crystal meth within 96 hours before the assault. Her assailant gave her vodka and told her to drink it, and told her to smoke some stuff from a pipe. She had some pelvic pain, and said her assailant had not used any weapons, threatened her, or hit her. She told the nurse she had told her assailant she did not like men and told him no, but he pulled her hands above her head, vaginally penetrated her, and forced her to give him oral sex. Zoila did not report anal penetration.

1.     *Evidence of prior crimes*

Amanda M. testified she was 26 years old and born in 1991. Douglas was the father of her eight-year-old son. She was 16 and Douglas was 24 and living with his family when they began their sexual relationship. In 2009, Douglas was convicted of having unlawful sexual intercourse with her when she was a minor. Their son was born in January 2010, six months before Douglas was released from jail.

The first time she had nonconsensual sex with Douglas, she was 16 and not answering his phone calls. He came over, and when Amanda M. told him she did not want to have sex and wanted him to leave, "[h]e said that I was his, he doesn't have to ask." Douglas took her into her bedroom, put her on the bed face down, pulled down her pants, and put his penis inside her vagina. She repeatedly said no but was unable to get him off her. A month later, while she was still 16, he picked her up from school, took her to his house, and threw her onto his bed face down. She said she did not want to have sex but he replied he "wanted to do what he wanted." He pulled off her pants and underwear and put his penis inside her vagina while she screamed. He once came to her high school and forced her into the car by grabbing her and pulling her hair, causing the school to call the police. He took her to his house and shut her into his room. Her father got a restraining order against Douglas.

When she was 19, Douglas beat her with a belt and a sandal and choked her. Saying he did not want to put his penis into her vagina because she might have pleasure, and he wanted to make sure it hurt, he raped her anally. She told him no, "but . . . by that point there is no fighting him." Douglas forced her to put his penis in her mouth when she was 19, grabbing her hair

with one hand and punching her with the other.  When she was 20 they moved to Las Vegas, and three or more times a week he forced her to orally copulate him, including while he sat on the toilet.  She always told him she didn't want to do it.  She became suicidal, and cut herself.  Once she jumped out the window and ran, and he brought her back inside.  She did call the police about the physical violence in August 2011, and in September 2012 reported he violated a domestic violence restraining order, but she was too scared to bring up the forcible sex.

Amanda ended her relationship with Douglas in 2013, on her son's third birthday.  A month later, he attacked her in a Wal-Mart, and she had not seen him since.

She had never met Zoila.  She knew Guadalupe S. because their children went to school together, but had not seen her for two years.  Douglas was dating Guadalupe S. when their relationship began.

Guadalupe S. testified she began dating Douglas in 2007, when she was 22.  The sexual relationship was consensual at first, but some months in, they were in Douglas's car when he pulled over in an industrial area.  She said she wanted to leave, and he grabbed her arm, told her she couldn't leave, and hit her. Douglas got her into the back seat and pulled her pants down. As she knelt facing the front passenger seat, he put his penis in her vagina while she cried and told him not to.  He also put his penis in her anus.  She was too scared to report the rape.

Around 20 times during their relationship, Douglas would put his penis in her anus when she told him not to, holding her so she could not move away.  Ten to 20 times, Douglas pulled Guadalupe by the hair to get her on her knees and pushed his penis into her mouth, grabbing her by the hair when she tried

to move her face away. Douglas had vaginal sex with her without her consent about 20 times.

Douglas had a small revolver and a semiautomatic pistol on him all the time and kept them in his room. The guns intimidated and scared Guadalupe. Once, when she told Douglas she wanted to leave his parents' house, he shot the semiautomatic into the floor of his bedroom, beat her badly with his fists, and forced her to have vaginal intercourse as she told him no.

Guadalupe ended the relationship in 2009, although she visited Douglas in prison. She knew Amanda had had a relationship with Douglas and they spoke on the telephone, but she had not seen her for four years. She never met Zoila.

In closing argument, the prosecutor argued Amanda's and Guadalupe's testimony showed Douglas's propensity to commit sexual crimes against women. Defense counsel argued Zoila was lying, and she actually had consensual sex with Douglas, pointing to inconsistencies in her statements to the deputy, the nurse, and detectives. Amanda and Guadalupe never reported forcible sex, and they too were lying. In rebuttal, the prosecutor pointed out that all three women described similar sexual acts and predatory behavior by Douglas.

2. *Verdict and sentencing*

The jury found Douglas guilty on all four counts. The court denied Douglas's motion for new trial.

At sentencing, the trial court imposed the midterm of six years on each count for a total of 24 years in state prison.

## DISCUSSION

### 1. *The trial court did not abuse its discretion when it admitted evidence of Douglas's prior sexual misconduct*

Douglas argues the court abused its discretion when it allowed Amanda and Guadalupe to testify about his prior sexual misconduct against them.

Before trial, the prosecutor moved to introduce evidence of Douglas's treatment of Amanda and Guadalupe. Both women would testify that Douglas forced them to engage in nonconsensual sexual intercourse, sodomy, and oral copulation. The evidence was admissible as propensity evidence under Evidence Code section 1108, and its probative value outweighed any undue prejudice under Evidence Code section 352. In opposition, Douglas argued the prior acts were remote in time, and the proposed evidence was unduly prejudicial because it included physical violence such as punching, pulling, and slapping.

At a hearing, Douglas's counsel argued the domestic violence evidence was extremely inflammatory, some of the acts against Amanda occurred when she was a minor, and Guadalupe never reported any nonconsensual sexual acts. The trial court stated it believed the evidence was probative. Neither woman's testimony would describe acts more heinous or inflammatory than the charged acts ("I would say they are probably about the same"), the testimony would not take up a lot of time, and the prior conduct was not too remote in time. The court allowed the evidence, warning the prosecution "the facts of domestic violence, where there was no sexual conduct, should not be gone into by the prosecution."

Evidence of prior criminal acts is generally not admissible to show a defendant's predisposition to commit the charged acts. (Evid. Code, § 1101, subd. (a).) In an exception to that rule, Evidence Code section 1108 provides that evidence of other sex offenses is admissible in a trial for sex crimes if the evidence is not unduly prejudicial under Evidence Code section 352. (*People v. Soto* (1998) 64 Cal.App.4th 966, 983-985.) Evidence of other sex offenses can help the jury with "resolution of any issue in the case, including the probability or improbability that the *defendant has been falsely accused." (People v. Robertson* (2012) 208 Cal.App.4th 965, 990, italics added.)

An important question is whether the challenged "propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.) Douglas argues the prejudice created by Amanda's and Guadalupe's testimony clearly outweighed its probative value, because the prior sex crimes involved substantial violence and thus were not similar to the sex offenses Zoila described. We review the trial court's decision to admit the evidence for an abuse of discretion. (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 965 (*Hernandez*).)

The sexual offenses described by Amanda and Guadalupe were strikingly similar to the sexual offenses described by Zoila. Each woman testified Douglas forcibly penetrated with his penis her vagina and anus while she told him to stop and told him no. Each woman testified he forced her to copulate him orally. Guadalupe and Zoila testified that Douglas carried a semiautomatic weapon with him all the time. Zoila testified

that he placed the weapon within sight before he raped her, and Guadalupe testified he shot a round into the floor before he raped her vaginally. All the women testified that although they repeatedly said no to Douglas and told him to stop, he would continue. As Amanda put it, Douglas "wanted to do what he wanted," which was to rape the women vaginally and anally, and force them to copulate him orally.

The evidence was not identical, but "there is no requirement that the charged and uncharged offenses be so similar that evidence of the prior acts would be admissible under section 1101." (*Hernandez*, *supra*, 200 Cal.App.4th at p. 966.) Although Zoila had met Douglas the night he raped her and Amanda and Guadalupe had long-term relationships with him, each woman testified their interactions with Douglas began amicably. Each woman testified that later, when he wanted sex and they made it clear that they did not, he forced them to engage in multiple unconsented-to sexual acts. The uncharged acts were similar in nature, and highly probative of Zoila's credibility.

Douglas argues that the domestic violence testified to by Amanda and Guadalupe was absent from Zoila's testimony. But "any dissimilarities in the alleged incidents relate only to the weight of the evidence, not its admissibility." (*Hernandez*, *supra*, 200 Cal.App.4th at p. 967.) The trial court considered the potential for undue prejudice, admonished the prosecutor not to go into the facts of domestic violence when there was no sexual conduct, and at one point halted the prosecutor's examination of Guadalupe to ensure that she would testify to nonconsensual sexual activity.

The jury was properly instructed that if the jury concluded the prosecution showed by a preponderance of the evidence that Douglas committed the uncharged acts, "that conclusion is only one factor to consider along with all the other evidence. It is not sufficient, by itself, to prove that the defendant is guilty of counts 1 through 4. The People must still prove the charge beyond a reasonable doubt." We presume the jury followed that limiting instruction, which removed the risk Douglas would be punished in this case for his past offenses against Amanda and Guadalupe. (*People v. Ervine* (2009) 47 Cal.4th 745, 776; *People v. Anderson* (2012) 208 Cal.App.4th 851, 895-896.)

The court did not abuse its discretion by admitting uncharged crime evidence.

Douglas also argues the admission of the testimony violated due process. The admission of evidence, even if erroneous, violates due process only if it makes the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) For the reasons above, we reject Douglas's argument that admitting evidence of the uncharged acts made his trial fundamentally unfair.

## 2. *Douglas is not entitled to a hearing on his ability to pay fines and assessments*

The trial court also ordered Douglas to pay a $300 state restitution fine under section 1202.4, subdivision (b) (while imposing and staying an identical parole revocation fine), a $40 court security fee under section 1465.8 on each count, and a $30 criminal assessment fine under Government Code section 70373 on each count. Douglas did not object to any of those fines and fees. He now asserts that we should order the assessments reversed and the restitution fines stayed

unless and until the prosecution proves he has the present ability to pay them. He also argues we must remand for a hearing regarding his ability to pay under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). The California Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, 96-97, review granted Nov. 13, 2019, S257844, and *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946, which disagreed with the analysis in *Dueñas*. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073.)

Douglas did not object to the imposition of the fines, fees, or assessments, or claim an inability to pay. *Dueñas* was decided three months before Douglas's sentencing hearing in April 2019, so there was authority supporting a request for an ability to pay hearing at the time of sentencing. Douglas has forfeited his right to challenge the fines and fees on appeal. (Cf. *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 [defendant did not forfeit *Dueñas* argument where the case was decided after sentencing]; see *People v. Aguilar* (2015) 60 Cal.4th 862, 866-867 [defendant's failure to object at sentencing to certain fees on the basis of his inability to pay forfeited the issue on appeal].) We therefore do not remand for an ability to pay hearing on the restitution fine, the court security fee, and the criminal assessment fine.

Douglas contends that if the failure to object forfeited the issue, his counsel provided ineffective assistance. "[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) On the record before us, Douglas cannot establish counsel had no tactical reason for not objecting, or that the failure to object prejudiced him.

### 3. *Douglas's presentence custody credits must be corrected*

The trial court awarded Douglas 760 days of presentence credit against his prison sentence for actual time spent in confinement before sentencing, and 114 days of local conduct credit, for a total of 874 days credit. On appeal Douglas argues, and Respondent agrees, that he is entitled to 761 days of actual presentence credit. We therefore order the custody credit award corrected to reflect a total of 875 days of predisposition custody credit.[2]

**DISPOSITION**

We modify the judgment to reflect a total of 875 days of predisposition custody credit.  As so modified, we affirm the judgment of conviction.  The trial court is to prepare an amended abstract of judgment and to forward a certified copy to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



LAVIN, Acting P. J.



DHANIDINA, J.