Filed 6/10/22  P. v. Burgess CA4/1
Opinion following rehearing

OPINION ON REHEARING

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078156 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE392962) |
| KEVIN BURGESS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Over the Fourth of July holiday in 2019, Kevin Burgess strangled his estranged wife Jane Doe[1] to unconsciousness two times, fashioned a noose and put it around her neck, prevented her from leaving the house, and told Jane's young children he would kill her if they tried to leave the house to get help. He was convicted by a jury of assault, corporal injury to a spouse, false imprisonment by violence or menace, making a criminal threat, and misdemeanor willful cruelty to a child. At trial, the prosecution was permitted to present evidence of three uncharged acts of prior domestic violence, in which Burgess had physically isolated Jane, strangled her, and threatened to kill her.

Burgess appeals, claiming the trial court committed evidentiary error when it admitted evidence of his prior acts of domestic violence pursuant to Evidence Code section 1109, subdivision (a)(1).[2] He also contends the court committed instructional error because it failed to inform the jury that it could not consider the prior acts of domestic violence when deciding his guilt of the charged crimes of false imprisonment or willful cruelty to a child. He further contends there was insufficient evidence to support his convictions for false imprisonment and making a criminal threat.

After we affirmed the judgment in our initial opinion, filed on April 26, 2022, Burgess filed a petition for rehearing asking this court to consider

---

[1] Pursuant to rule 8.90(b)(4) of the California Rules of Court, we use an anonymous first name and surname to protect the victim's identity. In subsequent references, we use only the first initials of the victim's children, and the name and first initial of the surname of the testifying adult witnesses.

[2] All further unspecified statutory references are to the Evidence Code.

2

whether he is entitled to be resentenced under Senate Bill No. 567 (Senate Bill 567) (Stats. 2021, ch. 731, § 1.3), which was enacted while the appeal was pending. Senate Bill 567 amended Penal Code section 1170, subdivision (b), effective January 1, 2022, to limit the situations under which an upper-term sentence could be imposed. Here, the trial court sentenced Burgess to the upper term of four years on the principal count (Pen. Code, § 245(a)(4)), doubled to eight years due to a strike prior (Pen. Code, § 667, subds. (b)–(i)), and increased by five years due to a serious felony prior (Pen. Code, § 667, subd. (a)(1)), for a total prison commitment of 13 years. We granted the rehearing petition. After considering the parties' arguments, we conclude the matter must be remanded to the trial court for resentencing under the new law. We affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *The Evidence At Trial*

Trial began on February 5, 2020. After the prosecution presented its case-in-chief, the defense rested without presenting evidence. We summarize the testimony from the prosecution's witnesses.

A. *The Charged Crimes of July 4 and July 5, 2019*

1. *Jane's Testimony*

Jane and Burgess had been in an on-and-off romantic relationship since 2010. They married in April 2018 and were still married at the time of trial in February 2020.[3] Between March and July 2019, they were separated but trying to get back together. Jane lived in a two-story townhome with her

---

[3] At the time of the trial, Jane had reconciled with Burgess. She acknowledged she did not want to testify, because despite what Burgess had done to her, she still loved him.

3

five children:  S. (age 12), R. (age nine), A. (age eight), B. (age six), and J. (age three).  Burgess had moved out and had not lived in the townhome since March 2019.

At around 8:00 a.m. on July 4, 2019,[4] Jane and six-year-old B. were asleep in Jane's upstairs bedroom.  Jane was awakened by Burgess yelling at B. to get up and clean her room.  Burgess had come into the house uninvited and unannounced, and Jane did not know how he got in.  When Jane sat up in bed, she could see Burgess "down the hall . . . yelling at [B.] to clean her room."  Burgess "physically" but not "forcefully" took B. to her room, while the child was "groggy" and "disoriented" from still being "half-asleep."  Jane started yelling at Burgess, and he yelled back.  At some point, he grabbed Jane's cell phone and "smashed" it on the bathroom counter, breaking it and rendering it inoperable.

Burgess then stood blocking the entranceway to her bedroom.  Jane "freak[s] out" when an entrance or exit is blocked; it causes her to have "a panic attack" and makes it "hard [for her] to breathe."  But Jane wanted to avoid "hav[ing] this type of day," so she sat down and played a music video on her bedroom television.  The song she played was "Independence Day"—a song about "family violence."  Playing that song was Jane's "passive aggressive" response, a "Fuck You" message, to Burgess's "drama" of coming in uninvited, screaming at B. and breaking her phone.  Hearing the song, Burgess broke the television by throwing the smashed phone at it.

Jane pushed past Burgess to get out of the bedroom, and tried to go downstairs.  But Burgess followed her.  They were "tussling" on the stairs. He was "trying to hold [her] from going downstairs," and she "was trying to

_____

4       All further dates refer to 2019 if no year is specified.

4

break free of him."  At some point, Burgess "put his hands around [her] neck."  Jane cannot remember "anything after that."

The next thing Jane remembered was waking up at the bottom of the stairs.  Her face was wet because Burgess and some of her kids had put water on it.  She felt "disoriented and weak."  Burgess was trying to help her get up but she "couldn't move."  She did not know how long it took until she was able to get up, but eventually, she got to the couch.  Later, when she went to the bathroom, she noticed her panties were wet.  She had urinated on herself.

Jane remained disoriented for "quite a while" the rest of the day.  But it was the Fourth of July, and she had changed shifts at work to spend the holiday with her kids.  So even though she "was in shock," she barbecued on the back patio "to try to salvage it for them."

Burgess remained in the house the rest of the day and night.  Jane was scared with Burgess in the house, because the kids were there and Burgess "wasn't himself."  "He was a maniac . . . [l]ike . . . when a bipolar person . . . has . . . like a severe attack, and they're not all there."  Jane did not feel she could leave the house alone.  She did not try because she felt "very, very weak, and very disoriented."  She also believed Burgess "probably wouldn't have allowed" her to leave without him.  In the evening of July 4 or the "early morning" of July 5, inside the garage, Burgess tried to tie her arms together with something, either a zip tie or a shoelace, but she "fought it off."  Jane did not sleep much that night because Burgess was "opening every box and going through everything" in the house.

The next morning on July 5, Jane was trying to come up with a plan "to get out of the house without escalation," but she was having trouble thinking.  "[Her] head was going really slow."  And she was trying to get her "gears to

move properly," but "they were not." Jane did not know how they were going to escape but she told 12-year-old S. to "[b]e dressed [and] ready."

Jane made several attempts to leave the house by going "towards the front door." But each time, Burgess stopped her. Once, Burgess stopped her from getting through the front door by grabbing her sweater and pulling her back in so that she "went back into . . . the couch or something."

In another attempt to escape, Jane and S. boosted eight-year-old A. over the back patio fence so he could go get help from the children's babysitter who lived about half a mile away. But after they put A. over the fence, "he didn't go." Instead, he came back around to the front door and rang the doorbell. When Burgess heard the doorbell, he ran out the back door, but when he realized it was only A., he came back inside.

Burgess's violence escalated. He took an extension cord and "looped it" or tied it into "an oval."[5] He told Jane, "he was going to hang himself and [her]." He first tried to put the noose around Jane's neck. But S. thwarted him. She either hit Burgess or did something else to give Jane "enough leverage" for Jane to get the noose off her neck. Burgess then put the noose around his neck. He attached the other end of the cord to the balcony, and tried to commit suicide by stepping on a "five-gallon thing" and jumping off. "[H]is face started to swell up," but "he didn't die."

At that moment, Jane told S. "she had to go." "Everything was escalating." But Burgess told the children, "if they left, that he would hurt" Jane. It was possible Burgess said he would "kill" Jane, but she was not "a

---

[5]     In his opening brief on appeal, Burgess called it a "noose."

hundred percent" certain that he used those words.[6]  Burgess's threat scared Jane.  It also made S. "reluctant" and "scared" to leave.  Despite her fear, S. climbed the back patio wall to go get help.  She stopped at the top of the wall to tell Burgess, "Don't hurt my mom."  S. jumped, and Burgess lunged at Jane.  Jane did not remember anything else after that except the sound of eight-year-old A. screaming.

When Jane woke up, she was on the ground.  Her children were standing over her.  Burgess was kneeling on her side trying to wake her up and telling her to go find S.  Jane "was slow" and her "body was really heavy."  She was disoriented, her neck hurt "all over," and she was having "problems breathing."  Still, Burgess was trying to hurry Jane out the door to go retrieve S.

Next, Burgess, Jane, and the other children walked down the street towards the babysitter's house; they presumed S. had gone there.  They heard sirens, and Burgess immediately ran away.  The sirens turned out to be unrelated to their ordeal.  Jane and the children continued down the street when, a few minutes later, the babysitter pulled up in her car with S.  The babysitter took the family back to her house.  Jane was disoriented and tired.  The children were all scared.

On the following Monday, July 8, Jane went to the courthouse and filed for a restraining order.  The same day, she sought out a domestic violence advocate and reported the incident to the police.  She waited to file the police report because she was concerned that Child Protective Services (CPS) might act on the police report "immediately and probably remove the kids."  She wanted to tell CPS what happened directly to avoid losing the children.

---

[6]    S. testified that Burgess told the children and Jane that "he would kill" Jane if any of the children left.

7

## 2. *S.'s Testimony*

S. was 13 years old at the time of trial. She woke up on the morning of July 4 to Jane and Burgess arguing. At some point, Jane and Burgess were on the stairs and S. saw Burgess "choking" her mother. He was "gripping [her mother's neck] tightly" with both of his hands. Her mother was not saying anything, because "[s]he couldn't." Jane passed out and fell down "[o]n the bottom of the stairs." Jane "wasn't waking up" and her body "was shaking a little bit."

S. was scared. She was "trying to get [Burgess] off [her] mom" by hitting him. When her mother woke up, she was "[w]eak" and "[i]t was hard for her to get up." Burgess helped Jane get up, and she sat down on the couch for a short time. After that, her mother went to the kitchen for food, "[b]ecause it was the Fourth of July."

S. did not see "anything else physical" happen between Jane and Burgess the rest of that day. But S. saw her mother try to leave the house three times. Each time, Burgess "wouldn't let her" leave. He would block the door, and one time "[he] pushed her away from it." S. was worried that her mother "wouldn't make it," that "she would pass away."

That night, S. slept in the living room with her three-year-old brother J. When she woke up the next day, Burgess was still in the house. At around 9:00 a.m., S. heard her mother and Burgess arguing. Jane was sitting on the couch, and Burgess was either upstairs or coming down the stairs. Burgess had shoved a "door stopper" at the front door so "you can't open it." Jane "tried to go to the door and unlock it" but Burgess "pushed her down" and "told her, 'You can't leave.'"

Burgess threatened all the children and Jane that "he would kill" Jane if any of the children left. S. believed him and she was scared. At one point,

A. had jumped over the patio wall, but "then he had to come back because [Burgess] said he was going to kill [their mother]." Burgess made the threat before and after A. went over the wall. He had threatened to kill Jane if any of them left "[a]bout five times."

S. saw Burgess "choke" her mother with his hands a total of about six times on July 4 and 5. It happened differently each time. Sometimes he would use two hands, sometimes he would use one. He would choke her for longer or shorter periods of time. One time S. saw Burgess choke Jane on the back porch. At first, he "was just using his hands." Later, Burgess tried to choke Jane with an electrical cord connected to an electrical fire pit they used to make S'mores on the Fourth of July. Burgess took the cord and tied it into a circle "big enough to go around her neck." Then, as Jane was walking into the kitchen, Burgess "tried to put it around her neck," but "she ducked[.]" "[T]hen he had tried to [do it] again, but she moved." As this was happening, S. was "pushing him away from her" mother so "it wouldn't go around her neck."

S. tried to leave the house to get help three times. First, she tried to leave through the garage, but the garage door would not open. She tried to leave a second time after Burgess tried to put the cord around her mother's neck. She "hopped the wall," but then jumped back over into their patio when Burgess said "he was going to kill" Jane. It was then that Burgess "walked over to [Jane] and started choking her" on the patio. S. escaped on the third try when Jane threw a skateboard at Burgess over the fence and S. went after it. S. ran to a friend's house across the street but no one was there. She then ran to the babysitter's house because she was scared Burgess would kill her mother while she was gone.

9

### 3. *A.'s Testimony*

A. was almost nine years old at the time of trial. On July 5, A. saw Burgess hit and push his mother. A. said he was trying to "stop the fight." He climbed over the wall that day because "Mom asked for help," and he went "[t]o go get some help." But after he got over the wall, A. explained, "I just stayed there, because I was scared." He was scared "[o]f Mom getting hurt" because Burgess told him he would "do something bad to her" if A. jumped over the wall. A. believed Burgess. He had already seen that Burgess "had a knife" and "an extension cord . . . tied around in a loop," and he "[s]tarted choking [his mother]." A. loudly told Burgess " 'stop' " a lot of times. A. saw his mother had "blacked out." He thought his mother "[l]ooked like she was dead."

### 4. *The Babysitter's Testimony*

At around 9:30 a.m. on July 5, S. came to the babysitter's house with a panicked look on her face. She immediately told the babysitter her mother needed help. The babysitter had never seen S. so scared. S. told her "they had been trapped in the house since yesterday, the Fourth of July." Burgess had broken the phone so they had no way to call for help. S. also explained "she was told that, if any of them get out of the house, [Burgess] said that he would kill them, anybody who was left in the house."

They got into the babysitter's car and sped towards Jane's house. S. was shaking and scared that Burgess "would do something to her mom" before she came back with help. S. told the babysitter that Burgess "choked" Jane and S. "had to pull him off" her mother. At that moment, they saw Jane and the other children "running up the street." The children looked scared, "[l]ike they were trying to get away from something." The family got into the car. Jane's hair and clothing were disheveled. Her face and neck were

10

"really red." She had scratches on her arms and redness on her wrists. And she was "out of it."

5. *Thomas R.'s Testimony*

Jane's friend Thomas R. saw her about two days after the Fourth of July holiday. She had multiple bruises, so Thomas took photographs of her neck, chest, and arm. The bruising on Jane's chest were "the worst of them." Jane asked Thomas to take down the noose that was tied around a two-by-four on her patio, "because she couldn't stand to look at it." After he took it down, he realized he should have photographed it, so he put it back near its original location and took a photograph. The jury was shown these photographs.

6. *Dr. Steven Campman's Testimony*

Dr. Campman, the Chief Deputy Medical Examiner for San Diego County, testified as an expert on the subject of strangulation. He explained strangulation is a form of asphyxiation caused by pressure on the outside of the neck. Lay people sometimes mistakenly refer to strangulation as "choking," but, medically, choking refers to the airway being blocked from the inside. There are different types of strangulation, including manual strangulation, ligature strangulation, and hanging. All are potentially lethal.

What happens when someone is strangled depends on how much pressure is applied, and how long the pressure is applied. Strangulation involves compression to two main sets of structures in the neck: the airway (trachea or windpipe) and the blood vessels (jugular vein and carotid arteries). Different amounts of pressure are required to compress these structures. It only takes about 4.4 pounds of pressure to compress the jugular veins, and about 11 pounds of pressure to compress the carotid arteries, but it takes about 33 pounds of pressure to compress the trachea, or

11

windpipe. An average 30-year-old man's "handshake," i.e. his grip strength, is around 100 to 120 pounds. Thus, an average man's hands would be strong enough to block any or all three of the jugular veins, carotid arteries or trachea in the neck.

Compressing the blood vessels in the neck can stop blood flow, and thus oxygen, to the brain. Or it can stop blood filled with carbon dioxide from draining out of the brain, causing a potentially damaging carbon dioxide build-up in the brain. Similarly, when the trachea is blocked, oxygen or air is prevented from flowing to the lungs. A person can lose consciousness from strangulation. The amount of time it takes for a strangled person to lose consciousness depends on the amount of pressure applied and where it is applied. If both carotid arteries are completely blocked, unconsciousness can happen in as little as six seconds. If the blockage of blood flow or air flow is incomplete, it will take longer for the oxygen concentration in the blood to drop.

When a person is strangled to unconsciousness, some of her brain cells may temporarily lose function, or if the loss of oxygen continues, the cells may die and permanently lose function. Irreversible brain damage can happen in as little as five minutes. "[T]he longer a person is strangled, the more damage to the brain that person is getting." Brain damage is also more likely to occur if there are multiple incidents of strangulation as opposed to one.

A victim of strangulation will not always have outwardly visible injuries. Loss of bladder control is a commonly reported symptom or sign of strangulation.

In a person with no physical injuries, the loss of consciousness and bladder control and memory problems can be consistent with strangulation or

seizures.[7] But a tender or swollen neck is not attributable to seizures. Also, in the case of a person with a history of seizures, "strangulation lowers the seizure threshold"—that is, "if someone has a seizure disorder and they're strangled, they're more likely to have a seizure brought on by the strangulation." Strangulation can also induce a seizure in a victim with no history of seizures. As Dr. Campman explained: "Not only would someone who has an existing seizure disorder be more likely to have a seizure because of the lack of oxygen from the strangulation, but . . . one of the signs of strangulation . . . can be a seizure. [¶] When someone . . . is lacking enough oxygen in their brain, one of the things that happens, and can precede death, is a seizure."

---

[7] Jane testified that it occurred to her, after the Fourth of July incidents but before the preliminary hearing, that after Burgess put his hands around her neck when they were on the stairs, she had suffered a "long seizure." She explained that she had suffered a "big" seizure in 2012, and also had previously experienced one or two "very minor" seizures. Several days before July 4, she ran out of her antiseizure medication. She believed "that probably played a part as well" in her loss of consciousness. She testified that one of her children told her she had been "shaking" while lying on the floor. But she admitted that on July 4, before she lost consciousness on the staircase, Burgess had applied pressure to her neck; that she had been trying to fight him off; that she was having difficulty breathing; and that the next thing she remembered was waking up at the bottom of the stairs.

13

B.    *The Uncharged Acts of Domestic Violence*[8]

  1. *Jane's Testimony About the March 20 and March 24 Incidents*

On March 20, Burgess "choked" Jane more than once during an argument. After he had been "gone for days," Burgess called Jane to meet him at the hospital because he had been in a motorcycle accident. Jane was mad that Burgess "didn't call for days," so rather than go to the hospital, she "left to go play bingo." When she got home, Burgess was already there and "enraged." He thought Jane was cheating on him because she did not go to the hospital. The argument turned physical, and he choked her with his hands more than once. It was less severe than when he choked her in July in that she did not blackout. Burgess got on his motorcycle and left.

Jane did not call the police on March 20, "[b]ecause [Burgess] had never done that before." She believed Burgess was acting "out of character" and he was having "severe mental health issues." She did not want to get him into trouble. But she called 911 four days later because Burgess was not "deescalating" and she "didn't have a choice."

On March 24, Jane came home and saw Burgess's motorcycle. She got scared because of what happened on March 20. Burgess saw Jane and "started to . . . come towards [her]." He "ran into the street" after her and she ran to a nearby convenience store to call 911. A recording of the 911 call was played for the jury.

Jane told the emergency dispatcher, "on the 20th my husband almost murdered me, he like choked me and punched me and all kinds of stuff and

---

8    Over the defense's objection, the trial court granted the People's motion in limine to admit evidence of three uncharged acts of domestic violence that occurred in March 2019, pursuant to section 1109, subdivision (a)(1). Later, we discuss the proceedings related to the motion in limine in further detail in connection with Burgess's claim of evidentiary error.

14

he came back." She explained that she still "ha[d] a black eye and bruises" from the incident. The dispatcher asked Jane if he was still at the home and Jane responded: "I was hiding . . . around the corner because I seen his motorcycle and then he seen me and then he ran into the street and grabbed my hair and said he was gonna murder me. . . . I like hid behind a car and . . . then he drove by on his motorcycle, but he's gonna come back and he took my phone so, I don't have a way to call you from my house."

After she called 911 on March 24, Jane requested an emergency protective order. She also met with a police officer, who took photographs of the black eye and a bruise to the arm that she sustained in the March 20 incident. These photographs were shown to the jury. The police also interviewed nine-year-old R. about the March 24 incident. On cross examination, Jane admitted she interrupted the interview and prompted R. to agree that he saw Burgess hit her. On redirect, she explained she was being "a little controlling" but was not trying to tell R. to "give a different story[.]"

    2.    *Megan S.'s Testimony About the March 28 Incident*

In 2019, Megan S. lived on the same street as Jane. On March 28, while she was standing outside her home with a friend, Megan saw two women walking up the street. One of them was pushing a little boy in a wagon. A man on a motorcycle approached the women and began "yelling at them pretty loudly."

Megan identified Burgess in court as the man on the motorcycle. She described the two women as both White with brown hair. She was shown a photograph of Jane and testified, "I know that woman was there. Which of the two, I don't remember." She explained "it's been a while" and the best she could recall was that Jane, from the photograph, was "one of the two

15

ladies that was walking down the sidewalk that [Burgess] yelled at." Megan did not know any of these people.

Megan testified that Burgess "kept going at it and [was] just yelling." Burgess then stopped and "got in one of the lady's face and was yelling at her." She heard the lady "telling him to leave her alone and to leave, and . . . to get out of her face." Megan thought Burgess's behavior was "pretty crazy." He was initially yelling at the lady who was pushing the wagon with the little boy. Then the other lady "tried to kind of get him away from her," she got out a cell phone and was trying to call for help, but the man grabbed it out of her hand.

Burgess then "got back into the other lady's face and continued trying to talk with her." When "he was getting really in her face," Megan stepped in and told Burgess he should leave, "because [the lady] clearly didn't want him there." Megan threatened to call the police but Burgess did not stop. While Megan's friend called the police, Burgess "had pinned [the lady] into a corner, up against the fence, and was holding her there, and wouldn't let her go, and she was screaming to let go and for help." Megan yelled at him to stop. The man let the lady go, but he did not leave. When the police came, he was still there.

C.   *Recorded Jail Calls from November and December*

Burgess had tried to call Jane from jail over 500 times. Jane "guesstimate[d]" that out of these calls, she actually spoke to Burgess 30 times. The jury heard excerpts of recorded calls Burgess made from jail on November 5 and 6, and December 5 and 19.

In the November 5 call, Burgess and Jane discussed the possibility of Jane telling the prosecutor she was not coming to court. Burgess said, "it just makes it easier for me to beat the case."

16

In the November 6 call, Jane was unhappy with Burgess and reluctant to assist him by not testifying. She asked Burgess, "[D]o you realize how close everything came?" She told Burgess she could "see a difference" in herself, and that she was having difficulty "process[ing] verbally." She told Burgess: "I'm not saying I don't love you. . . . [But] I'm scared of you."

In the December 5 call, Jane and Burgess again discussed the possibility of Jane not appearing for trial. Burgess suggested that if Jane were to tell the prosecutor she would not testify, the prosecutor would "kick it out and I'll get out." Jane said, "I don't want to risk anything with you . . . doing major time . . . , but at the same time, . . . I'm already scared of you and I don't know how to not be." She talked about the possibility of Burgess "tak[ing] the deal" because then she would not be "in any kind of position." She told Burgess, repeatedly: "I'm scared of you."

Finally, in the December 19 call, Burgess told Jane: "I know you're scared, and I don't blame you, believe me, I don't, I don't blame you at all." Jane responded, "Every part of me . . . would love for us to work out." At the same time, she asked Burgess: "[H]ow can I feel safe with you. [Transcription states Jane is crying.] How would I know you wouldn't try to kill me again?" Jane explained she has thought about "a possible statistic where [she] don't end up gone." She asked Burgess, "Do you understand that my bladder had already emptied?[9] That that's the last thing before you're gone." Burgess offered the following responses: "You're not [going to end up gone]. If I was gonna kill, I would kill you. I'm not gonna kill you." "I'm not gonna kill you. You are fine. I know it's gonna take time for you not to be scared of me, but [Jane], I've never loved nobody like, like this."

---

9   This appears to be a reference to Jane urinating on herself during the strangulation on July 4.

Under cross examination, Jane explained the recordings of jail calls played for the jury were not complete. She offered explanations for some of their conversations. For example, when Burgess suggested to Jane that she not come to court, she had already told Burgess she did not want to testify. When Jane told Burgess she was scared of him, she meant she was "scared of his mental health issues, and if he's not taking care of himself, us ever going down that road again."

## II.

### *Closing Arguments, Verdict, and Sentence*

A. *Closing Arguments*

1. *The Prosecutor's Closing Argument*

Burgess was charged in an amended information with two counts of assault by means of force likely to produce great bodily injury (counts 1 and 2; Pen. Code, § 245, subd. (a)(4)), corporal injury to a spouse (count 3; Pen. Code, § 273.5, subd. (a)), making a criminal threat (count 4; Pen. Code, § 422), false imprisonment by violence, menace, fraud, and deceit (count 5; Pen. Code, §§ 236, 237, subd. (a)), and misdemeanor willful cruelty to a child (count 6; Pen. Code, § 273a, subd. (b)). It was alleged that Burgess inflicted great bodily injury under circumstances involving domestic violence in the commission of counts 1 and 2 (Pen. Code, § 12022.7, subd. (e)), and that he suffered a prior conviction that qualified as a serious felony (Pen. Code, § 667, subd. (a)(1)) and a strike (Pen. Code, § 667, subds. (b)–(i)).

The prosecutor argued the jury should find Burgess guilty of assault with force likely to cause great bodily injury (counts 1 and 2) based on the evidence he strangled Jane two times to unconsciousness on July 4 and 5. She argued Jane had suffered brain damage from the strangulation, which was great bodily injury to support true findings on the related enhancement

18

allegations. She further argued the bruises, red marks, and swelling on Jane's arms, chest, and neck were injuries sufficient to support a guilty verdict on the crime of corporal injury to a spouse (count 3).

The prosecutor argued that any of Burgess's many threats to kill Jane on July 4 and 5 would justify a verdict of guilty on the crime of making a criminal threat (count 4). As for false imprisonment (count 5), the prosecutor argued that Burgess had kept Jane in the house against her will. He had used menace by threatening to kill her, and had used violence when he physically pushed her when she tried to leave. On misdemeanor willful cruelty to a child (count 6), the prosecutor argued Burgess had inflicted mental suffering on S. by causing her to experience panic and terror. Finally, the prosecutor argued Burgess showed consciousness of guilt when he ran after hearing sirens and tried to convince Jane not to testify at trial.

2.    *Defense Counsel's Closing Argument*

Defense counsel argued that Jane was a dishonest and unreliable witness. She had lied to the police in 2015 and had encouraged S. to lie.[10] Defense counsel argued that Jane was equally dishonest about everything that occurred on July 4 and 5. Overall, Jane had "lie[d] and exaggerate[d] this whole crime report."

Defense counsel told the jury the alleged false imprisonment "didn't happen," and that it could not convict Burgess of making a criminal threat because "there was no oral threat." Defense counsel asserted that Jane had simply suffered two seizures and blamed them on Burgess, and that "[S.]

---

[10]    Under cross examination, Jane admitted that in 2015, she made a false statement to the police about an incident not involving Burgess. She also "[i]nitially" had S. lie, and told S. to tell the police "that somebody else . . . was at the house."

19

knows [her mother] just had a seizure." She further asserted that the witnesses had "all talked about this," that the babysitter was not truthful and was merely "trying to be helpful," and that Thomas had made the noose himself and had "fabricated evidence." Defense counsel stated, "this case cannot be proven beyond a reasonable doubt because it started with that faulty foundation of an unreliable, dishonest witness making the report of a crime that has not been supported by any police officer in this case."

### 3. *The Prosecutor's Rebuttal Argument*

Responding to defense counsel's assertions that the witnesses were dishonest, the prosecutor argued it was unreasonable to conclude that all of the witnesses, even including the babysitter and Thomas, who had no motive to lie, would testify falsely. She pointed out that Jane testified she still loved Burgess, and that she had been an unwilling witness who was not interested in getting Burgess in trouble.

The prosecutor also argued the witnesses' descriptions of Burgess's actions on July 4 and 5 were consistent with the evidence of his prior acts of violence in March. The March 28 incident was witnessed by a stranger, Megan, who had no reason to lie. The prosecutor told the jury that if it found by a preponderance of evidence the March incidents had occurred, it could rely on them as "one factor" supporting the conclusion Burgess had committed the charged offenses involving domestic violence on July 4 and 5.

### B. *Verdict and Sentence*

After deliberating for two days, the jury convicted Burgess on all six counts. It found the two enhancement allegations charging Burgess with infliction of great bodily injury to be not true. Burgess admitted he suffered a serious felony prior (Pen. Code, § 667, subd. (a)(1)) and a strike prior (Pen. Code, § 667, subds. (b)–(i)). On October 5, 2020, the trial court sentenced

Burgess to a total prison term of 13 years. At Jane's request, the court also entered a criminal protective order effective for the maximum period of 10 years.

DISCUSSION

I.

*The Trial Court Did Not Abuse Its Discretion By Admitting Evidence of Uncharged Acts of Domestic Violence*

Burgess contends the trial court abused its discretion by admitting evidence of the three uncharged acts of domestic violence from March. He contends the balance of interests under section 352 favored exclusion of this evidence, and that the trial court violated his due process rights by admitting the evidence. We conclude there was no evidentiary error, and thus no constitutional violation.

A.    *Additional Background*

In a motion in limine, the prosecution sought to admit evidence of the March 20, 24, and 28 incidents pursuant to section 1109, subdivision (a). The defense moved in limine to exclude such evidence. At the hearing on the motions, the prosecutor stated she would question Jane about all three incidents. She proffered that Jane's testimony would be corroborated by one of Jane's children, who was home on March 20 and March 24 and had been interviewed by police on March 24, and by Megan, the witness to the March 28 incident. Defense counsel responded that Jane had told her child what to say to the police, such that the child was not a reliable witness. Defense counsel also asserted the proffered evidence was inadmissible under section 352.

The trial court granted the prosecution's motion, ruling all three incidents were admissible. It observed that section 1109 does not require

21

"perfect corroboration" and stated it was satisfied there was "sufficient corroboration." The court further determined the probative value of the evidence was not substantially outweighed by a danger that its admission would create undue prejudice, and that it was therefore not inadmissible under section 352.

During trial, defense counsel renewed her objection to the March 28 incident on the basis that the prosecutor had not questioned Jane about it, meaning Megan's testimony about the incident would not be corroborated. Defense counsel argued that "abundant" time had already been spent on establishing the March 20 and 24 incidents. The trial court overruled the objection.

After Megan testified about the March 28 incident, the trial court stated on the record outside the presence of the jury that there had been a sidebar conference during which the court had said it would strike Megan's testimony unless the prosecution established the incident had involved Burgess and Jane. Defense counsel argued Megan's identification of Jane was insufficient because she described the victim as having brown hair, whereas "here in court, [Jane] had blond hair." Defense counsel also argued Megan's testimony lacked probative value because Megan had been unable to confirm Jane was the victim.

The trial court declined to strike the testimony. It observed that section 1109 required the prosecution to prove a prior act of domestic violence by a preponderance of the evidence, and ruled that Megan's testimony was sufficient to satisfy this burden. Referring to section 352, the court further ruled that the probative value of Megan's testimony was not outweighed by the probability its admission would create undue prejudice.

B.    *Admission of Uncharged Domestic Violence Offenses under Section 1109*

"Ordinarily, propensity evidence—evidence that a defendant committed an uncharged offense—is inadmissible to prove the defendant's disposition to commit the charged offense.  (§ 1101, subd. (a).)  Evidence that the defendant committed uncharged crimes or other acts, however, is admissible to prove relevant facts other than disposition, such as motive, intent, and absence of mistake or accident.  (§ 1101, subd. (b).)"  (*People v. Kerley* (2018) 23 Cal.App.5th 513, 531 (*Kerley*).)

Section 1109 is yet another legislative carveout to this general rule against admitting propensity evidence and provides an exception in domestic violence cases.  It states:  "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."[11]  (§ 1109, subd. (a)(1).)  "As a result, section 1109 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.' "  (*Kerley, supra*, 23 Cal.App.5th 513, 531, quoting *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.)

"[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence."  (*People v. Johnson* (2000) 77 Cal.App.4th 410, 420.)  "[T]he legislative history of the statute recognizes the

---

11    Section 1109, subdivision (e), provides that "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

23

special nature of domestic violence crime, . . . : 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without propensity inference, the escalating nature of domestic violence is likewise masked. . . . Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' (Assem. Com. Rep. on Public Safety (June 25, 1996) pp. 3-4.)." (*Id.* at p. 419.) Section 1109 thus " 'reflects the legislative judgment that in domestic violence cases . . . similar prior offenses are "uniquely probative" of guilt in a later accusation.' " (*Kerley*, *supra*, 23 Cal.App.5th at p. 531.)

Before admitting evidence of a defendant's "other domestic violence," section 1109 expressly requires the trial court to exercise its discretion under section 352 to determine whether the "probative value [of the evidence] is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§§ 1109, 352.)

The " 'determination as to whether the probative value of [prior uncharged acts] evidence is substantially outweighed by the possibility of . . . unfair prejudice or misleading the jury is "entrusted to the sound discretion of the trial judge who is [in] the best position to evaluate the evidence." ' " (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966 (*Hernandez*).) "We review a challenge to a trial court's decision to admit [this] evidence for abuse

of discretion." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*).) "A trial court's exercise of its discretion under section 352 ' "must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.)

C.    *Analysis*

1.    *The Prior Uncharged Acts of Domestic Violence Did Not Lack Probative Value*

Burgess's challenge to the trial court's exercise of discretion under section 352 focuses in large part on the contention that the evidence he abused Jane in March lacked probative value. He offers two reasons why this is so. First, he contends the prior incidents were not frequent, regular or severe. Second, he contends the degree of certainty that the incidents actually occurred was reduced, thus diminishing their probative value, because the trial testimony about them was uncorroborated. We reject both contentions.

Burgess's first argument about the purported lack of frequency, regularity, and severity of his uncharged domestic violence offenses is based on his interpretation of *Kerley, supra,* 23 Cal.App.5th at pages 534–536. He contends his own prior acts of abuse were not as frequent, regular, or severe as the uncharged domestic violence incidents held admissible in *Kerley.* So he contends his assaults and threats on Jane on three separate occasions in March were not as probative as the uncharged acts admitted in *Kerley.* This argument lacks merit.

" 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274; *Hernandez, supra,* 200 Cal.App.4th at p. 966 [a

25

significant factor in determining the probative value of the evidence is
" 'whether the uncharged conduct is similar enough to the charged behavior
to tend to show the defendant did in fact commit the charged offense' "].)
"[P]roponents of the bill that became section 1109 argued for admissibility of
such evidence because of the 'typically repetitive nature' of domestic
violence," a "pattern" that "suggests a psychological dynamic not necessarily
involved in other types of crimes." (*Johnson, supra,* 185 Cal.App.4th at
p. 532.)

Thus, the probative value of a defendant's uncharged abusive acts
arises primarily from the similarity between the uncharged act and the
charged conduct. The repetition of similar abusive behavior suggests the
defendant has a pattern of engaging in particular forms of domestic violence
under particular circumstances. For example, in *Johnson, supra*, 185
Cal.App.4th 520, an attempted murder case in which the defendant was
alleged to have shot his girlfriend, the Court of Appeal held the trial court
properly admitted evidence of two prior instances in which the defendant had
shot other girlfriends. (*Id.* at pp. 532–533.) Although the shootings occurred
more than 10 years before the charged crime, their probative value was great
because they demonstrated a pattern of the defendant using guns against his
domestic partners to exact revenge when he felt rejected by them. (*Ibid.*)

Here, Burgess's acts of domestic violence in March revealed a
behavioral pattern also seen in his conduct in July underlying the charged
offenses. In the March 20 incident, Burgess, while angry at Jane and arguing
with her verbally, escalated the argument into a physical confrontation by
"choking" Jane multiple times. On March 24, he took Jane's phone from her,
threatened to kill her, and attempted to restrain her movement by grabbing
her hoodie and pulling on her. On March 28, he "got in [Jane's] face,"

grabbed her companion's phone when the companion tried to call for help, and then pinned Jane against a fence and held her there, restraining her movement, as she screamed for help. In these incidents, Burgess showed a pattern of escalating verbal arguments into physical confrontations, a tendency to use strangulation as a method of inflicting physical harm on Jane, a tendency to restrain Jane's movement using physical force, and to prevent Jane or others from calling for help in response to his abuse. These patterns of depriving Jane of her phone, controlling her movement and then escalating to strangulation were strikingly similar to Burgess's conduct on July 4 and 5. His prior acts of domestic violence were thus highly probative of his tendency to commit acts like those he was accused of committing here.

Burgess's reliance on *Kerley* does not persuade us to conclude otherwise. A review of *Kerley* reveals the facts and issues presented in that case to be quite different from those presented here. In *Kerley*, the defendant was accused of murdering his girlfriend. She went missing, and her decomposed body was discovered and identified more than a decade later. (*Kerley*, *supra*, 23 Cal.App.5th at pp. 521–526.) The cause of death, including whether it had resulted from an assaultive act, was disputed, and revolved around competing expert interpretations of fractures in the ribcage of the deceased victim. (*Id.* at pp. 525–527.)

During the prosecution's case-in-chief, "[t]he jurors learned that, over a period of 10 years, Kerley regularly punched and kicked [the decedent], slapped her, threw her to the ground when she was pregnant, punched and kicked her in the stomach when she was pregnant, restrained her from leaving the home, stalked her, beat her in the back with a two-by-four, kicked her in the eye, mopped the floor with her face and hair, stomped on her hand and foot, and repeatedly threatened to kill her." (*Kerley*, *supra*, 23

27

Cal.App.5th at p. 540.) The Court of Appeal concluded the trial court did not err by admitting this evidence under section 1109. (*Id.* at pp. 539–540.) It reasoned that evidence of Kerley's prior assaults was "directly relevant" because "the fact that [he] regularly assaulted the victim is evidence the jury can use to conclude, along with other evidence, that [he] assaulted the victim in committing the charged crime." (*Id.* at p. 539.)

Rejecting Kerley's argument that the evidence was inflammatory and prejudicial under section 352, the Court of Appeal reasoned that Kerley's behavior represented "compelling evidence" of his propensity to beat his partner, that "[t]he frequency and regularity with which Kerley beat [the decedent] provided vivid proof he would likely beat [her] again," and that "[t]he severity and viciousness with which [Kerley] assaulted [the decedent] was probative of the intensity and depth of his willingness to harm her." (*Kerley*, *supra*, 23 Cal.App.5th at p. 540.) The court explained, "this type of 'prejudice' is not the 'prejudice' envisioned by section 352." (*Ibid.*)

Turning back to this case, Burgess argues that his abusive acts in March were not probative because they were not as frequent, regular, or severe as in *Kerley*. The comparison with *Kerley* misses the point. That particularly egregious acts of violence were admitted in *Kerley* does not, on its own, establish a general rule requiring evidence of domestic violence to be just as egregious to be admissible in other cases. The probative value of a defendant's prior domestic violence incidents comes from the defendant's tendency to engage in a particular pattern of abuse. The probative value of this evidence is in the similarity of defendant's later conduct to his own earlier behavior, not the similarity of the defendant's abusive acts to those of *another* defendant, particularly another defendant accused of a dissimilar offense. Burgess, unlike the defendant in *Kerley*, was not on trial for

28

murdering his partner by crushing her ribcage. Burgess's uncharged misconduct did not need to be similar to uncharged acts admitted in *Kerley* to be probative here.

Burgess's next argument about the limited probative worth of the March incidents has to do with an asserted lack of corroboration. Burgess contends the prior instances of domestic violence lacked probative value because the degree of certainty they actually occurred was "[g]reatly [r]educed" by the fact they were "uncorroborated." He asserts that Jane's trial testimony about the March 20 and 24 incidents was "entirely uncorroborated" and that the testimony of Megan was "likewise uncorroborated by any other witness." We reject these contentions.

At the outset, section 1109 does not mandate corroboration. The relevant part of the statute states: "Subject to a hearing conducted pursuant to Section 352, which shall include *consideration* of *any* corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (§ 1109, subd. (d)(3), italics added.) "Consideration of a factor such as corroboration does not mandate the existence of that factor." (*People v. Mani* (2022) 74 Cal.App.5th 343, 373 (*Mani*).) Thus, under section 1109, "corroboration is not a requirement." (*Id.* at p. 372.)

Also, contrary to Burgess's argument, evidence corroborating Jane's testimony about the March 20 and 24 incidents *was* presented at trial. The word "any" in section 1109, subdivision (d)(3), signals that "the nature of the corroboration can be anything that serves as corroboration." (*Mani*, *supra*, 74 Cal.App.5th at p. 373.) "Thus, contemporaneous reports to the police can serve as corroboration that an event occurred." (*Ibid.*) Here, Jane called 911

on March 24 and reported the abuse Burgess committed that day as well as on March 20. The recording of the 911 call, which was played for the jury, was evidence corroborating Jane's in-court testimony. The jury had the opportunity to hear the audio of Jane as she reported the incidents to the authorities, and was able to consider her vocal intonations and affect close in time to the alleged events, and evaluate her credibility. That was not all. In addition, the police responded to the call and photographed Jane's black eye and the bruising on her arm. These photographs were shown to the jury, and they served as additional corroboration of Jane's testimony that Burgess had physically abused her.

As for the March 28 incident, Burgess's assertion that Megan's testimony was "uncorroborated by any other witness" is not untrue. But as noted, section 1109, subdivision (d)(3), does not condition the admissibility of a prior incident of domestic violence on the existence of corroborative evidence. (*Mani*, *supra*, 74 Cal.App.5th at pp. 372, 373.)

Burgess nevertheless contends that *People v. Stanley* (1967) 67 Cal.2d 812 (*Stanley*) required the trial court to exclude any uncorroborated uncharged acts. His reliance on this case is also misplaced. *Stanley* stands for the proposition that "uncorroborated testimony of the *prosecuting witness* as to noncharged offenses" should generally be excluded. (*Id.* at pp. 817–818, italics added.) Since, as we have just explained, the March 20 and 24 incidents were corroborated by other evidence, we consider his argument as addressing the March 28 incident testified to by Megan. But Megan's testimony does not fall within the rule articulated in *Stanley*, because she was not the prosecuting witness. Further, in the wake of *Stanley*, our high court has emphasized that *Stanley* "expressly declined 'to adopt rigid rules' " of admissibility, and has confirmed that a trial court retains discretion to

30

admit uncorroborated testimony about the defendant's uncharged acts. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 407, 408.)  Further still, *Stanley* did not involve a prosecution for domestic violence, and it was decided before the Legislature adopted section 1109 to ensure that patterns of domestic violence should not go unseen.  For these reasons, *Stanley* is inapposite.

In his reply brief on appeal, Burgess contends for the first time that Megan's testimony should have been excluded on the ground it was "ambigu[ous]," because although Megan was able to identify Jane as one of the two women she saw on March 28, she was unable to confirm whether Jane was the victim or the victim's female companion.  Burgess contends that to conclude Jane was the victim would be "speculation."

This contention is belated and unaccompanied by a showing of good cause for the delay, and it is therefore forfeited.  " 'Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief[.]' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218 (*Rangel*) [defendant forfeited a contention about a reason the trial court erred in admitting evidence by raising the contention for the first time in reply].)

And even if not forfeited, the contention lacks merit.  When considering whether to admit evidence of an uncharged act, "[t]he trial court must make a preliminary determination of whether the proffered evidence is sufficient for the jury to find, by a preponderance of the evidence, that the defendant committed an enumerated offense." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 353.)  The trial court's determination of this preliminary fact is reviewed for an abuse of discretion.  (*Ibid.*)  " 'The court should exclude the proffered evidence only if the "showing of preliminary facts is too weak to support a favorable determination by the jury." ' " (*Ibid.*, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 466.)

31

Here, the jury was presented with sufficient evidence from which it could conclude by a preponderance of the evidence that Jane was the victim of the March 28 incident. Although Megan was unable to confirm, based on Jane's appearance in a photograph shown to her by the prosecutor, that Jane was the person Burgess yelled at and pinned against the fence, other details of Megan's testimony supported the conclusion Jane was the victim. Megan was confident in her identification of Burgess as the perpetrator. Megan confirmed the incident occurred on March 28 on Jane's street, and that the lady yelled at by Burgess was "pushing the wagon with the little boy." When the jury heard these details of the March 28 incident, it had already learned Jane was the mother of J., a 3-year-old boy. The jury had also heard that four days before March 28, Jane had reported Burgess to the authorities and had sought a restraining order against him. The jury could infer from this evidence that Jane was likely the person pulling the wagon with the little boy as well as the object of Burgess's rage, and therefore the victim of the March 28 incident.

Finally, in his reply brief, Burgess appears to offer another new argument: he asserts that section 1109 propensity evidence is inherently prejudicial, and therefore must have substantial probative value to be admissible under section 352. This belated position, unaccompanied by an explanation for the delay, has been forfeited. (*Rangel, supra*, 62 Cal.4th at p. 1218.) In any event, to the extent Burgess means to contend that the probative value of the March incidents was not substantially probative, we disagree. As discussed above, the pattern of behavior revealed by these uncharged incidents was so similar to the conduct involved in the charged offenses as to be highly probative of his behavioral tendencies and propensity to commit the charged acts of domestic abuse.

In summary, we reject Burgess's claims that the probative value of the evidence of his prior abusive acts on March 20, 24, and 28 was diminished either because his misconduct was not as regular, frequent, or severe as the uncharged conduct admitted in *Kerley*, or because it was uncorroborated.

2. *Burgess Fails to Demonstrate That the Probative Value of the March 2019 Incidents Was Outweighed by a Factor Favoring Exclusion Under Section 352*

As we have noted, Burgess's contention that his prior acts of domestic violence should have been excluded under section 352 focuses on the assertedly diminished probative value of the incidents. He presents very little by way of argument addressing the other side of the section 352 equation.

In the analogous context of section 1108,[12] courts have stated that when determining whether evidence of uncharged misconduct should be excluded pursuant to section 352, "the probative value of the evidence must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282, citing *People v. Harris* (1998) 60 Cal.App.4th 727, 737–741.) In addition, "other-crimes evidence . . . 'is

___

12 Section 1108 applies when a defendant is charged with a sexual offense. Subdivision (a) of section 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Section 1108 and section 1109 "are virtually identical, except that one addresses prior sexual offenses while the other addresses prior domestic violence." (*People v. Johnson, supra*, 77 Cal.App.4th at p. 417.)

33

inadmissible if not relevant to an issue expressly in dispute' " or " 'if "merely cumulative with respect to other evidence which the People may use to prove the same issue[.]" ' " (*Harris*, at p. 737.)

Here, Burgess argues the evidence of his uncharged acts should have been excluded as "cumulative" because it was " 'beyond dispute' " he had the propensity to commit domestic violence. His claim that his propensity toward domestic violence was "undisputed" relies on the fact that he was convicted of the charged offenses. In his words: "if the jury was convinced beyond a reasonable doubt that the requisite elements of each of the charged crimes was proven (which it would have to be to reach convictions even without the evidence of the uncharged crimes) then proof by uncharged crimes evidence of a propensity to commit those crimes was cumulative."

This argument is devoid of merit. The record of the proceedings in the trial court makes clear that whether Burgess committed, and therefore had the propensity to commit, the charged offenses was not undisputed. Burgess pled not guilty to the charges in the amended information. He did not stipulate to any element of any offense. (See *People v. Valdez* (2012) 55 Cal.4th 82, 131 [allegation not undisputed where the record did not clearly show defendant offered to stipulate to it].) His trial counsel vigorously disputed his guilt, telling the jury the acts described by Jane had been fabricated, "didn't happen," and "can't be proven beyond a reasonable doubt." On this record, Burgess's contention on appeal that it was undisputed he committed the charged offenses borders on the frivolous. The fact that he was convicted does not demonstrate his guilt was undisputed. Rather, it simply demonstrates that the jury resolved the issues in dispute against him.

In summary, we reject Burgess's claims that the evidence of the March 20, 24, and 28 incidents should have been excluded because they were

insufficiently probative or were cumulative. The trial court did not abuse its discretion in admitting this evidence under section 1109, subdivision (a). Because there was no evidentiary error, Burgess's due process rights were not violated. (See *Mani, supra,* 74 Cal.App.5th at pp. 374–375.)

### *The Trial Court Did Not Commit Instructional Error*

The trial court instructed the jury pursuant to CALCRIM No. 852A. In relevant part, the instruction stated:

> "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically on March 20, 2019; March 24, 2019; and March 28, 2019. [¶] *Domestic violence* means abuse committed against an adult who is a spouse or a person who dated or is dating the defendant. [¶] *Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. [¶] . . . [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the charged offenses involving domestic violence on July 4th and 5th 2019."

Burgess contends the trial court committed instructional error because it did not correctly limit the "charged offenses involving domestic violence" for which the jury could consider the propensity evidence. He maintains that willful cruelty to a child (Pen. Code, § 273a) and false imprisonment (Pen. Code, § 237, subd. (a)), are not domestic violence crimes, and that the jury should not have been permitted to rely on the March incidents when deciding whether he was guilty of committing these two charged offenses. He contends the trial court was required to give the jury a limiting instruction telling the jury the propensity evidence "was only applicable to domestic

violence counts" and not to the counts charging him with willful cruelty to a child or false imprisonment. He contends the court's purported failure to instruct the jury in this manner was error, and that allowing the jury to consider his prior misconduct as evidence of a propensity to commit these crimes violated his right to due process.

Preliminarily, we note that Burgess's trial counsel did not object to the CALCRIM No. 852A instruction. However, "failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) Here, Burgess claims the alleged error deprived him of due process. "[B]ecause this would affect his substantial rights if true, his claim is not forfeited." (*Id.* at p. 580; see *Kerley*, *supra*, 23 Cal.App.5th at p. 542.) Accordingly, we consider the merits of Burgess's contention.

Burgess's claim that the trial court erred by failing to instruct the jury it could not consider the propensity evidence when evaluating his guilt of the charged crime of willful cruelty to a child is easily resolved. The jury was not misinformed. The instruction stated: "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit *the charged offenses involving domestic violence* on July 4th and 5th 2019." (Italics added.) The court defined "[d]*omestic violence*," in turn, as "abuse committed against *an adult who is a spouse or a person who dated or is dating the defendant*." (Second italics added.) This definition of domestic violence as a crime committed against "an adult" plainly excluded the Penal Code section 273a crime involving a child. This offense was simultaneously defined for the jury

36

pursuant to CALCRIM No. 823 as the "willful[ ] inflict[ion of] unjustifiable physical pain or mental suffering on a *child*." (Italics added.) Thus, the trial court did not fail to inform the jury that the March incidents could not be used to consider his propensity to commit the charged crime of willful cruelty to a child. There was no need for an additional limiting instruction.

Burgess's next contention—that the trial court was required to tell the jury it could not consider his uncharged misconduct when deciding his guilt of the charged crime of false imprisonment—also lacks merit. In this case, false imprisonment was an offense that involved domestic violence, and the jury was not prohibited from considering Burgess's prior abusive acts when deciding whether he committed this offense.

Under section 1109, " '[d]omestic violence' has the meaning set forth in Section 13700 of the Penal Code." (§ 1109, subd. (d)(3).) Penal Code section 13700, subdivision (b), provides that " '[d]omestic violence' means *abuse* committed against . . . a spouse[.]" (Italics added.) Penal Code section 13700, subdivision (a), states, " 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."

Section 1109 applies where "the defendant is accused of an offense *involving* domestic violence." (§ 1109, subd. (a)(1), italics added.) The statutory word "involving" has been interpreted as broadening the scope of charged domestic violence offenses for which propensity evidence may be considered, because "[b]eing 'accused of an offense involving domestic violence' is broader than domestic violence which is defined as abuse committed against one of certain defined individuals." (*People v. Megown* (2018) 28 Cal.App.5th 157, 166.)

When deciding whether an offense constitutes a crime involving domestic violence, courts consider the manner in which the offense was committed. In *People v. James* (2010) 191 Cal.App.4th 478, the Court of Appeal held the crime of first degree burglary, although not facially a crime of domestic violence, qualified as a crime involving domestic violence under the facts of the case because the defendant "broke down the door of . . . a person with whom he had a dating relationship, and repeatedly made threatening remarks towards her" which placed her "in reasonable apprehension of imminent serious bodily injury to herself." (*Id.* at p. 483.) And in *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1194 (*Merchant*), this court held that a prior conviction of false imprisonment, as committed by the defendant, qualified as a domestic violence crime. The defendant had committed the offense by punching his girlfriend while driving on the freeway, refusing to take her home, and preventing her from leaving when they reached his house. This qualified as domestic violence because the defendant had placed the girlfriend "in reasonable apprehension of serious bodily injury." (*Id.* at p. 1195.)

Under the facts of this case, the false imprisonment charge clearly involved domestic violence. On July 4 and 5, Burgess smashed Jane's phone, weakened her by strangling her to unconsciousness, used physical force to prevent her from leaving the house, and threatened to kill her if she or her children left. Jane testified she was scared for her physical safety. The conduct and threats Burgess used to restrain Jane involved "causing or attempting to cause bodily injury." (Pen. Code, § 13700, subd. (a).) They also placed Jane "in reasonable apprehension of imminent serious bodily injury." (Pen. Code, § 13700, subd. (a).) Accordingly, the charged crime of false imprisonment was an offense involving domestic violence under section 1109.

The trial court was not required to instruct the jury that it could not consider the March 2019 events as evidence of Burgess's propensity to commit this offense. Section 1109 imposed no such limitation.

In his reply brief, Burgess contends for the first time on appeal that the March 28 incident did not qualify as an admissible act of domestic violence because Megan did not testify "there was any evidence [Burgess] intentionally or recklessly caused or attempted to cause bodily injury, or placed another person in reasonable fear of imminent [serious] bodily injury." This contention, offered belatedly and without a showing of good cause, is forfeited. (*Rangel*, *supra*, 62 Cal.4th at p. 1218.) It is also meritless. Megan testified that Burgess repeatedly got in the victim's face, his conduct "was pretty crazy," and he pinned the victim against a fence as she screamed for help. From this testimony, the jury could infer that Burgess placed the victim, Jane, in reasonable fear of imminent serious bodily injury.

For these reasons, we reject Burgess's claim of instructional error.

III.

*Section 1109 Does Not Violate the Due Process Clause of the Federal Constitution*

Burgess asserts that section 1109, by allowing the admission of evidence of prior uncharged crimes to prove a propensity to commit the charged crime, violates the due process clause of the federal Constitution. Clearly recognizing that California courts have rejected this claim, he states that he has included this argument to preserve the issue for future litigation.

In *People v. Falsetta* (1999) 21 Cal.4th 903, 915–916, the California Supreme Court rejected a due process challenge to section 1108, an analogous provision that renders evidence of a defendant's commission of prior sexual offenses admissible in a criminal action accusing the defendant of a sexual

offense. The rationale underlying *Falsetta* applies to section 1109, "since the two statutes are virtually identical, except that one addresses prior sexual offenses while the other addresses prior domestic violence." (*People v. Johnson*, *supra*, 77 Cal.App.4th at pp. 417, 420; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.) As this court has recognized, "[c]ourts have consistently rejected [the] claim . . . that the admission of propensity evidence under section 1109 violates due process." (*Merchant*, *supra*, 40 Cal.App.5th at p. 1194; see *People v. Baker* (2021) 10 Cal.5th 1044, 1090, fn. 6 [noting "that the Court of Appeal has rejected the view that section 1109 is distinguishable from section 1108 for due process purposes"].) Accordingly, we reject Burgess's challenge as raising an issue that has been settled unfavorably to him by the courts of this state.

## IV.

### *Substantial Evidence Supported Burgess's Convictions for False Imprisonment and Making a Criminal Threat*

Burgess's last claim on appeal is that insufficient evidence was presented at trial to support his convictions for false imprisonment by violence or menace (count 5) and making a criminal threat (count 4). We reject both contentions.

A. *Standard of Review*

Our consideration of these claims is governed by the following principles. When considering a challenge to the sufficiency of evidence supporting a conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also

*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 42; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The question is not whether we believe the evidence established the defendant's guilt beyond a reasonable doubt, but whether " ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Kelly* (1990) 51 Cal.3d 931, 956; *People v. Rich* (1988) 45 Cal.3d 1036, 1081.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B.    *Substantial Evidence Supported Burgess's Conviction for False Imprisonment by Violence or Menace*

Burgess was charged in count 5 with false imprisonment of Jane in violation of Penal Code sections 236 and 237, subdivision (a). "False imprisonment is the unlawful violation of the personal liberty of another." (Pen. Code, § 236.) False imprisonment is a felony if accomplished by "violence, menace, fraud, or deceit." (Pen. Code, § 237, subd. (a).)

At trial, the jury was instructed pursuant to CALCRIM No. 1240 on false imprisonment by means of violence or menace. The instruction told the jury that to find Burgess guilty of this crime, the prosecution was required to prove that he "intentionally restrained, or confined, or detained someone by violence or menace" and "made the other person stay or go somewhere against that person's will." It further stated: "*Violence* means using physical force that is greater than the force reasonably necessary to restrain someone. [¶] *Menace* means a verbal or physical threat of harm, including use of a deadly weapon. The threat of harm may be express or implied." The jury

41

returned a verdict finding Burgess "guilty of the crime of false imprisonment by violence or menace." (Capitalization omitted.)

Burgess's challenge to his false imprisonment conviction focuses on the asserted absence of evidence he used violence to restrain Jane's movement. He emphasizes that Jane identified just one instance when he grabbed and pulled her sweater to keep her from going through the front door, such that she "went back into . . . the couch," and that according to S., of the two times he pushed Jane as she tried to make her way to the front door, Jane fell to the ground only once. He contends the force he used to keep Jane from leaving the house was no more than necessary to prevent her from leaving. So he argues his conviction should be reduced to a misdemeanor.

We disagree. Contrary to Burgess's contentions, grabbing Jane's sweater and pulling her backwards, and pushing her to the ground, involved sufficient force to constitute "violence" within the meaning of Penal Code section 237, subdivision (a). " 'Force is an element of both felony and misdemeanor false imprisonment. Misdemeanor false imprisonment becomes a felony only where the force used is greater than that reasonably necessary to effect the restraint. In such circumstances the force is defined as 'violence' with the false imprisonment effected by such violence a felony.' " (*People v. Castro* (2006) 138 Cal.App.4th 137, 140 (*Castro*).)

*Castro* is illustrative of the relatively minimal degree to which the force used by a defendant must exceed the force necessary to restrain his victim to constitute "violence" within the meaning of Penal Code section 237, subdivision (a). In *Castro*, the defendant drove by the victim and made sexual comments to her as she walked down the street. (*Castro, supra*, 138 Cal.App.4th at p. 139.) As she continued to walk, the defendant grabbed her

42

arm and pulled her towards him. (*Id.* at pp. 139, 141–142.) A jury convicted the defendant of felony false imprisonment. (*Id.* at p. 139.)

Rejecting the defendant's insufficiency-of-the-evidence challenge, the Court of Appeal reasoned: "[A]ppellant grabbed the victim and turned her around. If that is all that had happened, we would agree with appellant that his conduct amounted only to misdemeanor false imprisonment. But appellant pulled her toward his car, an act more than what was required to stop her and keep her where she was located." (*Castro, supra,* 138 Cal.App.4th at p. 143.) The court concluded "the evidence that appellant used force to pull the victim toward his car was sufficient to establish force above that required for misdemeanor false imprisonment" and that the defendant's conviction was therefore supported by sufficient evidence. (*Ibid.*)

Here, the degree of force Burgess used to restrain Jane exceeded the force necessary to restrain her to a greater degree than the differential in *Castro*. Like the defendant in *Castro*, Burgess did not just grab Jane and stop her movement by keeping her in place. Rather, on one occasion, he pulled her back with enough force that she "went back into . . . the couch." On two other occasions, he pushed Jane as she was heading for the front door, on one of these occasions hard enough that she fell to the ground. Pulling Jane back into the couch, and pushing her to the ground, was more force than necessary to stop her progress. The evidence was therefore "sufficient to establish force above that required for misdemeanor false imprisonment." (*Castro, supra,* 138 Cal.App.4th at p. 143.)

In addition, sufficient evidence was presented at trial that Burgess committed the crime using menace. In the context of false imprisonment, " '[m]enace' is defined as ' " 'a threat of harm express or implied by word or act.' " ' " (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.) "When a rational

fact finder could conclude that a defendant's acts or words expressly or impliedly threatened harm, the fact finder may find that there is menace sufficient to make false imprisonment a felony." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1491; see *id.* at pp. 1489, 1491–1493 [evidence sufficient to support a conviction of false imprisonment by menace where the defendant entered the victim's house while carrying a gun, told the victim "to 'keep quiet' and 'stay where [he] was,' " and followed the victim around the house while pointing the gun at the ground]; *Reed*, at p. 281 [evidence sufficient to support conviction of false imprisonment by menace where the victims were directed, at gunpoint, to get down and stay down on the floor, the gun was placed against each victim's head and used to pistol-whip one of them]; *People v. Newman* (2015) 238 Cal.App.4th 103, 107–109 [evidence sufficient to support conviction of false imprisonment by menace where defendant yelled " 'Nobody is going anywhere,' " while pointing a gun in the victims' direction during a robbery].)

The evidence at trial established that Burgess threatened to harm Jane expressly and by implication. Burgess strangled Jane until she lost consciousness, either because the strangulation reduced her blood oxygen level or because it induced a seizure. He strangled her several more times with no loss of consciousness, and he tried to put a noose around her neck with the intent of hanging her. Jane testified Burgess said he would hurt her, and possibly said he would kill her, if the children left the house. Jane testified she was scared by these threats "because he wasn't rational," and she was afraid he would hurt her. S. testified Burgess threatened to kill Jane "if she left or if any of [them] left." The babysitter testified that S. said "she was told that, if any of them get out of the house, [Burgess] said that he would kill them, anybody who was left in the house." Substantial evidence

44

supported the finding Burgess expressly threatened to harm Jane if she or the children left. He made the threats after strangling Jane, and then fulfilled his threats when S. left. This evidence was sufficient to support the conclusion that Burgess committed the false imprisonment by using menace.

We reject Burgess's contention that his felony false imprisonment conviction was supported by insufficient evidence.

C. *Substantial Evidence Supported Burgess's Conviction for Making a Criminal Threat*

Finally, we consider, and reject, Burgess's contention that there was insufficient evidence to support his conviction for making a criminal threat.

"[T]o prove the offense of making a criminal threat under [Penal Code] section 422, '[t]he prosecution must prove "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." ' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 630–631 (*Brugman*), quoting *In re George T.* (2004) 33 Cal.4th 620, 630.) " '[A]ll of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of [Penal Code] section 422.' " (*Brugman,* at p. 631; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137 ["The surrounding circumstances must be examined to determine if the threat is real and

45

genuine, a true threat."].)  The threat must place the victim " *'in sustained fear* for his or her own safety or for his or her immediate family's safety[.]' " (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201.)

Burgess acknowledges the trial evidence showed that on July 4 and 5, he stated several times he would kill Jane if anyone left the house.  But he contends these statements did not qualify as criminal threats because "the surrounding circumstances show that neither [Jane] nor [S.] took the words seriously, and they were certainly not in sustained fear as a result."  He contends Jane would not have "helped her children jump the fence" if she thought the threats were serious and was in sustained fear he would act on them.

Burgess's attempt to cast his threats as not serious fails because it ignores the evidence of his own assaults on Jane, which served as powerful evidence conveying " 'a gravity of purpose and an immediate prospect of execution of the threat[s].' " (*Brugman*, *supra*, 62 Cal.App.5th at p. 631.) "[T]he nature of the threat cannot be determined only at face value.  [Penal Code] [s]ection 422 demands that the purported threat be examined 'on its face and under the circumstances in which it was made.'  The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat." (*In re Ricky T.*, *supra*, 87 Cal.App.4th at p. 1137.) Burgess's threats were conveyed after the first time he strangled Jane to unconsciousness.  It was apparent from this assault Burgess had both the ability and willingness to make good on threats to commit an act harmful enough to kill or seriously injure Jane.  Later, Burgess proved by his own actions that his threats were serious:  as soon as S. escaped over the patio wall, he lunged at Jane and strangled her to unconsciousness again.

Burgess's contention that since Jane encouraged her children to jump the fence, she must not have been in sustained fear Burgess would actually harm her, is specious. Jane testified that Burgess's threat did, in fact, scare her; she unequivocally agreed with the prosecutor that on "July 5th, [she was] scared that he would hurt [her]"; and she testified that "[t]he whole time he was in the psychotic break, [she] was scared." Burgess also ignores Jane's testimony explaining why she encouraged her children to leave. She stated that on July 5 she was trying to come up with a plan of escape, not because she was unafraid of Burgess, but because his behavior was escalating. She was trying to figure out how "to get out of the house without escalation." She told A. to leave to get help from the babysitter. Jane testified that after Burgess tried to hang her with the electrical cord, she finally "told [S.] that she had to go," because "[e]verything was escalating." The jury could infer from this evidence that Jane perceived she was in grave danger whether or not the children tried to escape, and was ultimately forced to risk an escape because she needed help and saw no other options.

For these reasons, we reject Burgess's contentions that his threats to kill Jane if the children left the house failed to meet the requirements of Penal Code section 422, subdivision (a).[13]

---

[13] Burgess was charged with a single count of violating Penal Code section 422, subdivision (a). As we have already concluded the evidence of Burgess's threats to kill Jane if the children left the house was sufficient to support his conviction of this offense, we need not and do not consider Burgess's contentions that this conviction was not supported by other threatening statements he made on July 4 and 5.

## V.

### *The Matter Shall Be Remanded for Resentencing Pursuant to Penal Code Section 1170, Subdivision (b), as Amended*

As we have noted, Burgess admitted he suffered a serious felony prior (Pen. Code, § 667, subd. (a)(1)) and a strike prior (Pen. Code, § 667, subds. (b)–(i)). At the sentencing hearing, the trial court imposed upper-term sentences for each of Burgess's five felony convictions. The court selected count 1 (Pen. Code, § 245, subd. (a)(4)) as the principal count and sentenced Burgess to the upper term of four years, doubled to eight years due to his strike prior, and increased by five years due to the serious felony prior, for a total commitment of 13 years in state prison. The court imposed but ran the sentences on counts 2 through 5 (as well as the sentence on count 6, a misdemeanor) concurrently with the sentence on count 1, as follows: upper term of four years on count 2 (Pen. Code, § 245, subd. (a)(4)); upper term of four years on count 3 (Pen. Code, § 273.5, subd. (a)); upper term of three years on count 4 (Pen. Code, § 422); and upper term of three years on count 5 (Pen. Code, §§ 236, 237, subd. (a)). Each of these upper-term sentences on the subordinate counts were doubled due to the same strike prior (Pen. Code, § 667, subds. (b)–(i)).

At the time Burgess was sentenced, Penal Code section 1170, former subdivision (b), left it to the sentencing court's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice." (Pen. Code, § 1170, former subd. (b), as amended by Stats. 2018, ch. 1001 (Assem. Bill No. 2942) § 1.) In selecting the upper term on each count, the court stated that its sentencing decision was based on Burgess's failure to accept responsibility and his long criminal history. The court also based its decision on the probation report, stating it agreed with the probation report

48

"regarding factors in aggravation and mitigation." The probation report found there were no mitigating factors, and 10 aggravating factors, at least one of which related to Burgess's record of prior convictions.[14] The probation report recommended the trial court impose the upper term on each of Burgess's felony convictions.

While the present appeal was pending, the Legislature enacted Senate Bill 567, which made significant amendments to Penal Code section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Effective January 1, 2022, a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Pen. Code, § 1170, subds. (b)(1), (b)(2).) Bifurcation of such jury findings is also now required. (*Id.*, subd. (b)(2).) However, under the newly amended law, "the court may consider the defendant's prior convictions in

---

[14] The factors in aggravation were: (1) the crime involved the threat of great bodily harm; (2) the defendant was armed with a weapon at the time of the commission of the crime; (3) the victim was particularly vulnerable; (4) the defendant dissuaded witnesses from testifying; (5) the defendant has engaged in violent conduct that indicates a serious danger to society; (6) the defendant's prior convictions as an adult are numerous; (7) records indicate the defendant has served prison terms in five cases since the 1990s; (8) the defendant was on post-release community supervision when the crime was committed; (9) the defendant's prior performance on grants of community supervision has been poor; and (10) the defendant committed or attempted to commit a violation of Penal Code sections 243.4, 245, or 273.5 in the presence of a minor and the defendant is or has been a member of the minor's household or is a relative of the minor. (Cal. Rules of Court, rule 4.421(a)(1)–(a)(3), (a)(6), (b)(1)–(b)(5); Pen. Code, § 1170.76.)

49

determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (*Id.*, subd. (b)(3).)[15]

In a petition for rehearing, Burgess contends the amendments to Penal Code section 1170, subdivision (b), implemented by Senate Bill 567 apply retroactively to him. He requests that we vacate his sentence and remand to the trial court for resentencing under the new rules. In their answer to the petition, the People correctly concede the amendments are retroactive under *In re Estrada* (1965) 63 Cal.2d 740. Under the *Estrada* rule, we presume, absent evidence to the contrary, that statutes that reduce punishment for criminal conduct apply retroactively to all defendants whose sentences are not final on the statute's operative date. (*People v. Frahs* (2020) 9 Cal.5th 618, 626; *People v. Brown* (2012) 54 Cal.4th 314, 323; *Estrada*, at pp. 744–745.) By narrowing the permissible grounds on which a sentencing court can impose an upper term under Penal Code section 1170, subdivision (b), Senate Bill 567 is ameliorative on some sentences. Because the Legislature gave no indication these statutory amendments should apply prospectively only, under the *Estrada* rule we infer that the Legislature intended them to apply retroactively to all nonfinal convictions on appeal.

Although the People concede that amended Penal Code section 1170, subdivision (b), applies retroactively to convictions like Burgess's that remain nonfinal on appeal, they argue that for two reasons, there is no need to remand for resentencing. First, they contend the trial court's sentencing decision comported with Penal Code section 1170, subdivision (b)(3), to the extent it was based on Burgess's criminal history. Second, they contend that to the extent the trial court relied on aggravating factors that were not

---

15 The new sentencing rules reflected in subdivisions (b)(4) through (b)(7) of Penal Code section 1170, as amended, do not bear on this appeal.

presented to the jury and found to be true beyond a reasonable doubt, in violation of Penal Code section 1170, subdivision (b)(2), there was no prejudice because if the correct process had been followed, the jury would have found the underlying facts to be true beyond a reasonable doubt.

Both of these arguments are foreclosed by *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), a recent decision of this court. In *Lopez*, as here, the trial court relied on numerous aggravating sentencing factors in deciding to give the defendant an upper-term sentence, at least one of which related to the defendant's record of prior convictions. (*Id.* at pp. 465, 466.) We rejected the People's suggestion that because under Penal Code section 1170, subdivision (b)(3), the defendant's prior convictions did not have to be found true by a jury, there was no need to remand for resentencing. (*Lopez*, at p. 466.) We explained that where a trial court "originally relied on both permissible and impermissible factors in selecting the upper term," we could not affirm the sentence unless we could "be assured that the trial court *would have exercised its discretion to impose the upper term* based on a single permissible aggravating factor . . . related to the defendant's prior convictions." (*Id.* at p. 467.) Because the record failed to provide such assurance, a remand was necessary to allow the trial court to make an informed sentencing decision. (*Id.* at p. 468.)

This analysis from *Lopez* applies here, and leads to the same conclusion. Although the trial court relied on Burgess's criminal history in choosing to impose the upper term for each of Burgess's five felony convictions, it relied on a number of other aggravating factors as well. Even assuming Burgess's criminal history was properly considered under Penal

Code section 1170, subdivision (b)(3),[16] the court did not indicate it would have selected an upper term sentence if the additional aggravating factors were not present. Consequently, we cannot uphold Burgess's sentence on this ground.

In *Lopez*, we also rejected the People's second argument advanced in this case—that is, the defendant could not demonstrate any error in sentencing him under the former version of Penal Code section 1170 was prejudicial, because "a jury would have found true, beyond a reasonable doubt, the aggravating factors on which the trial court relied in selecting the upper term[.]" (*Lopez, supra*, 78 Cal.App.5th at p. 465.) We agreed with the People that the trial court's sentencing error should be reviewed for harmlessness under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18. Under this standard, an erroneous failure to submit a sentencing factor to the jury " ' "does not require reversal if the reviewing court determines it was harmless beyond a reasonable doubt." ' " (*Lopez*, at p. 465.) " 'The failure to submit a sentencing factor to a jury may be found harmless if the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' " (*Ibid.*)

However, we disagreed in *Lopez* that we could find the sentencing error to be harmless. The prosecution had not sought to prove the aggravating factors to a jury, and the defendant "had no reason to present evidence that might have contradicted evidence supporting truth of the facts underlying the

16     Burgess contends the record does not indicate that the criminal history factors found to be true in the probation report were supported by certified records of conviction. Our reliance on the analysis in *Lopez* makes it unnecessary for us to determine whether this is so.

aggravating factors relied on by the trial court." (*Lopez, supra*, 78 Cal.App.5th at p. 466.) We therefore could not say, for every aggravating factor relied on by the trial court, that " 'the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' " (*Ibid.*) Rather, we found "[i]t would be entirely speculative for us to presume, based on a record that does not directly address the aggravating factors, what a jury would have found true in connection with these factors." (*Ibid.*)

This analysis also applies here, and forecloses the People's second contention. Here, as in *Lopez*, at the time of trial, the prosecution was not required to present evidence in an effort to prove aggravating sentencing factors at trial. Burgess "would have had no reason to present evidence that might have contradicted evidence supporting [the] truth of the facts underlying the aggravating factors relied on by the trial court." (*Lopez, supra*, 78 Cal.App.5th at p. 466.) We therefore cannot say, for every aggravating factor relied on by the trial court, that " 'the evidence supporting that factor is overwhelming and uncontested, and there is no "evidence that could rationally lead to a contrary finding." ' " (*Ibid.*) Consequently, we cannot affirm Burgess's sentence on this ground.

The trial court, in sentencing Burgess, relied on aggravating factors that were neither stipulated to nor found to be true beyond a reasonable doubt by a trier of fact. Accordingly, the sentence imposed does not comply with Penal Code section 1170, subdivision (b), as amended by Senate Bill 567. For the reasons just discussed, we do not find this error to be harmless beyond a reasonable doubt. We therefore remand the matter to the trial court for resentencing consistent with the current version of Penal Code section 1170, subdivision (b). (See *Lopez, supra*, 78 Cal.App.5th at p. 468.)

53

## DISPOSITION

Burgess's sentence is vacated.  The matter is remanded to the trial court for resentencing.  The judgment is affirmed in all other respects.


DO, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.